## STATE OF CONNECTICUT *v.* ROBERT ELLIS
### (SC 16884)

Sullivan, C. J., and Borden, Katz, Vertefeuille and Zarella, Js.

Argued January 9—officially released July 27, 2004

*Daniel J. Krisch,* with whom were *Wesley W. Horton* and, on the brief, *Julia K. Ulrich* and *Jeffrey J. White,* legal interns, for the appellant (defendant).

*Nancy L. Chupak,* assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict,* state's attorney, and *Charles Stango,* assistant state's attorney, for the appellee (state).

*Opinion*

ZARELLA, J. The defendant, Robert Ellis, appeals from the judgment of conviction, rendered after a jury trial, of sixteen counts of sexual misconduct involving three separate victims.[1] With respect to the first victim, Sarah S., the defendant was convicted of one count of attempted sexual assault in the first degree in violation

---

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

of General Statutes §§ 53a-49[2] and 53a-70 (a) (1),[3] three counts of sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (2),[4] two counts of risk of injury to a child in violation of General Statutes (Rev. to 1999) § 53-21 (1),[5] three counts of risk of injury to a child in violation of § 53-21 (2) and one count of harassment in the second degree in violation of General

[2] General Statutes § 53a-49 provides in relevant part: "(a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime. . . ."

[3] General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ."

[4] General Statutes § 53a-73a (a) provides in relevant part: "A person is guilty of sexual assault in the fourth degree when . . . (2) such person subjects another person to sexual contact without such other person's consent . . . ."

[5] General Statutes (Rev. to 1999) § 53-21 provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child, or (2) has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of a Class C felony."

The defendant was charged with crimes that occurred from 1995 through 1999. The codifications of § 53-21 applicable to that period of time are the revisions to 1995, 1997 and 1999 and the amendments to those revisions by Public Acts 1995, No. 95-142, §1, and by Public Acts 1997, No. 97-147, §1. Although § 53-21 was also amended by Public Acts 2000, No. 00-207, §6, and by Public Acts 2002, No. 02-138, § 4, those amendments are not relevant to this appeal. For ease of reference, we refer herein to § 53-21 as revised to 1999.

Statutes § 53a-183 (a) (1).[6] With respect to the second victim, Julia S., the defendant was convicted of one count of sexual assault in the fourth degree in violation of § 53a-73a (a) (2), one count of risk of injury to a child in violation of § 53-21 (1) and one count of risk of injury to a child in violation of § 53-21 (2). With respect to the third victim, Kristin C., the defendant was convicted of two counts of sexual assault in the fourth degree in violation of § 53a-73a (a) (2) and two counts of risk of injury to a child in violation of § 53-21 (2). The trial court denied the defendant's motions for judgment of acquittal[7] and for a new trial and sentenced the defendant to a total effective sentence of thirty years, execution suspended after seventeen years, with thirty-five years probation.[8] This appeal followed.

[6] General Statutes § 53a-183 (a) provides in relevant part: "A person is guilty of harassment in the second degree when: (1) By telephone, he addresses another in or uses indecent or obscene language . . . ."

[7] The court granted the defendant's motion for judgment of acquittal with respect to count thirteen of the information, which charged the defendant with risk of injury to a child, and the state entered a nolle prosequi on that charge. The defendant thus appeals from the judgment of conviction on sixteen counts.

[8] The trial court sentenced the defendant as follows: count one, twenty years, execution suspended after thirteen years, thirty-five years probation; count two, ten years, execution suspended, three years probation; count three, one year, execution suspended, ninety days probation; count four, one year, execution suspended, ninety days probation; count five, one year, execution suspended, ninety days probation; count six, ten years, execution suspended, three years probation; count seven, one year, execution suspended, three years probation; count eight, ten years, execution suspended, one year probation; count nine, thirty days, execution suspended, one year probation; count ten, ten years, execution suspended, three years probation; count eleven, one year; count twelve, five years, execution suspended after one year; count fourteen, one year; count fifteen, one year; count sixteen, one year, execution suspended, three years probation; count seventeen, one year, execution suspended, three years probation.

The trial court further ordered that the sentences for counts two through ten run concurrently with the sentence for count one and that the sentences for counts eleven, twelve, fourteen, fifteen, sixteen and seventeen run consecutively to the sentence for count one. The trial court finally ordered that the defendant submit to sex offender registration for the remainder of his natural life plus twenty years.

On appeal, the defendant claims that the trial court improperly: (1) denied the defendant's motion in limine to exclude evidence of other misconduct from the case involving Sarah S.; (2) consolidated the case involving Sarah S. with the cases involving Julia S. and Kristin C. because the facts of the former case were much more shocking and violent than the facts of the latter two cases; (3) precluded the testimony of the defendant's alibi witness on the ground that Practice Book § 40-21 requires a defendant to give notice of an alibi witness for instances of uncharged misconduct and the testimony of the alibi witness in this case would have been collateral to the issues at trial; and (4) refused to conduct a thorough inquiry into a credible allegation of juror misconduct. The defendant also claims that the state failed to present evidence sufficient to prove beyond a reasonable doubt that he violated the second prong of § 53-21 (1), risk of injury to a child, as alleged in count ten of the information. We reverse the judgment of the trial court.

## I

## BACKGROUND

The jury reasonably could have found the following facts. The defendant was the coach and organizer of the Connecticut Express (Express), a highly competitive, traveling girls softball team that played throughout Connecticut and the United States. The Express consisted of three to five teams in various age groups, including a twelve and under team, a fourteen and under team and a sixteen and under team. The defendant coached each age group at one time or another. Many of the girls who played with the Express had hopes of playing softball in college and of obtaining college softball scholarships.

In addition to coaching the Express, the defendant participated in two other activities related to softball.

In 1994, the defendant began giving private batting and pitching lessons, initially at a facility in Shelton and, beginning in the fall of 1996, at a facility in Ansonia that the Express had purchased and renovated. In March, 1997, the defendant also formed, with one of his friends and two parents of Express players, the Fast Pitch Organization of States and Territories (FAST). The goal of FAST was to organize and stage national softball tournaments at various locations throughout the country and to conduct pitching and batting clinics.

The defendant had a reputation as an outstanding softball coach who could help the girls he coached obtain college softball scholarships. In addition to playing a major role in selecting team members, the defendant also acted as a mentor, friend and father figure to many of the girls he coached. The defendant talked to the girls not only about softball, but also about school, family problems, boyfriends and his and the girls' sexual experiences.

A

Charged Misconduct

Two of the three victims, Julia S. and Kristin C., played for the Express. Julia S. began playing for the Express in 1994 and Kristin C. began playing in 1998. Both girls also took numerous private lessons with the defendant.

Julia S. started taking private pitching lessons with the defendant when she was ten years old. For the next six years, she continued to take weekly lessons with the defendant while playing for the Express. Julia S. described the defendant as a "touchy-feely" type of person who routinely kissed and hugged the girls and placed his hands on their bodies to demonstrate proper form while they were pitching or hitting balls. She testified that she and the other girls grew accustomed to

this behavior and that she came to view the defendant as a father figure and friend with whom she could discuss her problems, although she never had occasion to do so. Even more important, she regarded the defendant as someone who could help her obtain a college softball scholarship.

According to Julia S., the incident that formed the basis for her charges against the defendant occurred during a pitching lesson at the Ansonia facility in the winter of 1998 when she was fourteen years old and a freshman in high school. Julia S. testified that, after the session was over and she was preparing to leave, her father, who had served as her catcher during the lesson, entered the defendant's office to make a telephone call. While her father was on the phone, Julia S. and the defendant waited in the office doorway, only five feet away, out of her father's sight. Julia S. testified that the defendant slowly "put his hand on my side and between my jacket and shirt. Somehow my sports bag fell off and he grabbed my breast. And I knew it wasn't an accident."

Julia S. further described the grab as the defendant holding her breast in his hand and massaging or groping it. She testified that she froze during the incident and that she could not say whether the groping continued for thirty seconds or ten minutes because it felt like forever. She explained that she did not tell her father what had happened because she was ashamed and afraid that he would not believe her. Following the incident, Julia S. remained a member of the Express and continued to take lessons from the defendant. She testified that "[the defendant] was the best. If you wanted to go anywhere in softball, you came to [the defendant]. He knew everyone. If you wanted to play in college [the defendant] was the person to go to. . . . He said that he'd help us get a scholarship. He would help us do our videotaping for our college tapes that we had to send out. He was very supportive in that

aspect." During the summer of 1999, while attending a tournament in Florida, Julia S. learned that the defendant had engaged in similar sexual misconduct with other players. At that point, she told her teammates and parents about the incident and discontinued her affiliation with the organization.

Kristin C. began taking pitching lessons from the defendant when she was thirteen years old. On his advice, she tried out for the Express and won a place on the fourteen and under team in 1998 and 1999. Kristin C., like other team members, wanted to obtain a college softball scholarship and the defendant told her that he could assist her in that effort. When Kristin C.'s parents were divorced, the defendant also became a father figure in her life and, through his advice and support, helped her to cope with certain problems that she was facing.

Kristin C. testified that she looked up to the defendant until the occurrence of two incidents in late 1998 or early 1999, when she was thirteen or fourteen years old. Both incidents took place at the Ansonia facility. In the first incident, Kristin C. had just finished a pitching lesson with the defendant when she and a fellow teammate began teasing him and held his office door shut so that he could not leave the building. The three then began to wrestle playfully. While they were wrestling, the defendant put his arm over Kristin C.'s shoulder, grabbed her breast over her clothes and squeezed it. When he did not release his grip, Kristin C. knew that the grabbing was not an accident and she froze, not knowing what to do. About thirty seconds later, the defendant let go. Kristin C. turned around and looked at the defendant, but he did not say anything. She then walked out of the building.

The second incident occurred about two months later when Kristin C. was sharing a meal after practice with

the defendant, her mother, a teammate and the parent of another player at the Ansonia facility. Kristin C. testified that, after she walked over to the food table, which was some distance away from where the group was sitting, the defendant came up behind her, put his arm over her shoulder and placed his hand on her right breast over her clothes. He then started tapping on the nipple of her breast. Kristin C. testified that she was too shocked by the defendant's behavior to react, so she merely continued to stand at the table. After the defendant left, she served herself some food, went back to the group and sat down in her chair as if nothing had happened. Kristin C. testified that she had not wanted to believe that the defendant's conduct during the wrestling incident had been intentional, but that, after the second incident, she knew that neither of the incidents had been an accident. Although she told her mother and the assistant coach what had happened, she asked them not to say anything to the defendant for fear that her chances for obtaining a college softball scholarship would be ruined. Not until she attended the tournament in Florida and heard other players describe their experiences with the defendant did Kristin C. tell the team about what the defendant had done to her.

Sarah S., the third victim, did not play for the Express, but met the defendant in the eighth grade when he gave her a pitching lesson. Thereafter, her principal connection to the defendant was through her sister, who played for the Express, and her father, who was one of the defendant's partners in FAST. In late 1995, or early 1996, the defendant began giving pitching lessons to Sarah S.'s sister and other players in the backyard of her home. He also came to her home on numerous other occasions to meet with her father on business related to FAST. In addition, Sarah S. sold T-shirts at FAST tournaments.

Sarah S. described five separate incidents of charged misconduct involving the defendant. Regarding the first incident, she testified that the defendant frequently called her home to speak to her father in the fall of 1995 when she was fourteen years old and a freshman in high school. She usually answered the telephone. In the beginning, the defendant engaged her in general conversation, but over time the conversations became more personal. The defendant asked her if she had a boyfriend, if she had ever had sex and if she wanted to have sex. He also told her about his own sexual experiences and partners. These conversations culminated in the defendant's telephoning and asking her to have phone sex with him. During the call, the defendant told her that he was masturbating and that he wanted her to "talk dirty" to him. Sarah S. became frightened and hung up the telephone. Although she did not report this conversation to her parents, she told her best friend. After the phone sex incident, she either hung up the telephone or immediately passed the telephone to her father when the defendant called her home.

Sarah S. also testified that, in the fall or early winter of 1995, at about the time of the phone sex incident, the defendant came up behind her while she was alone in the kitchen of her home getting herself a drink, grabbed her breasts over her school uniform and moved his hands down her body, over her thighs and up underneath her skirt. He then started to touch in between her legs over her boxer shorts. Sarah S. testified that the defendant's actions shocked her and that she did not know what to do because he was a family friend. She therefore tried to act as if nothing was happening and continued to pour her drink. When the defendant heard Sarah S.'s mother coming downstairs, he walked away.

Three more incidents occurred at Sarah S.'s home between the fall of 1996 and the summer of 1997 when

she was fifteen years old and a sophomore in high school. Two of the incidents took place when she was alone in the laundry room and her family was in another part of the house. On both occasions, the defendant came up behind her, grabbed her breasts over her clothing, moved his hands down her body and touched her in between her legs. As he did so, he remarked about her maturing appearance and said that she was beautiful. Once again, Sarah S. tried to ignore the defendant.

The third incident occurred in the family room during the summer of 1997 when Sarah S. was sitting by herself on the couch watching television. The defendant had been giving pitching lessons in her family's backyard and no one else was in the house at the time. The defendant entered the room, sat down beside her, opened his pants and drew her hands toward his exposed penis. When she pulled her hands away, the defendant placed his hand on the back of her neck and attempted to pull her face down to perform oral sex. She resisted and pulled her head free. The defendant then masturbated until he ejaculated. When he was finished, he got up to go to the bathroom. Sarah S. testified that she was scared and did not know what to do, so she got up from the couch and started using the computer. A few minutes later, the defendant returned, kissed her on the lips and tried to force his tongue into her mouth.

B

Uncharged Misconduct

The trial court also admitted testimony regarding two additional incidents of uncharged misconduct with respect to Sarah S.,[9] both of which took place in the summer of 1998 when she was seventeen years old.

---

[9] Testimony concerning the two incidents was admitted into evidence to show a common plan or scheme.

Sarah S. was in Florida with her family and other Express players for a softball tournament. During the tournament, she stayed in a rented house with members of her family, Kaitlyn M., who also played for the team, the parents of another Express player, the defendant and a friend of the defendant's with whom the defendant shared a bedroom. On July 30, the defendant's friend and Sarah S.'s mother left the tournament. Thereafter, the defendant entered Sarah S.'s bedroom around 1:30 a.m. on two consecutive nights and stood at the side of her bed. On both nights, he was wearing only his underwear and was masturbating. The first night, after telling Sarah S. to be quiet, the defendant placed his hand under her shirt and touched her breasts. He then ran his hand down her body, in between her legs and penetrated her vagina with his fingers. When Sarah S. tried to move away, he stopped her and told her to let him "pleasure" her. He then tried to climb on top of her, but she pushed him away. He told her that, since he had pleasured her, she needed to pleasure him. Sarah S. told him "no." The defendant responded that, if she was going to act like a little girl, he would treat her like one. He finally kissed her on the cheek and left the room.

The next night, the defendant returned to Sarah S.'s room at about the same time and engaged in similar conduct. Once again he told her that, since he had pleasured her the night before, it was her turn to plea-sure him. When Sarah S. turned over and tried to ignore him, he left her room. She did not tell her parents about the defendant's misconduct until the summer of 1999, when she learned that Kaitlyn M. and other Express players had had similar experiences with the defendant.

Additional testimony was given by Kaitlyn M., whose mother and the defendant were partners in FAST. Kait-lyn M. started playing with the Express when she was thirteen years old. She, like Julia S., described the defen-

dant as a physical, "hands on" coach. Kaitlyn M. then testified regarding an uncharged incident that took place in April, 1999, when she was fifteen or sixteen years old and a junior in high school. The incident occurred during her first batting lesson alone with the defendant at the Ansonia facility. She testified that the lesson began with routine hitting drills and general conversation, but that the defendant soon started making jokes about oral sex and referring to the fact that the large size of her breasts was affecting her batting swing.

After the lesson, she and the defendant went back to the defendant's office to pick up some mail for Kaitlyn M.'s mother. Once inside the office, the defendant closed the door and started asking her sexually oriented questions, commented on her maturing physical appearance and told her about some of his own sexual experiences. As he spoke, he moved his chair closer to her and touched her bare knee. She testified that she felt uncomfortable and did not say much. When the defendant continued to talk and told her that he fantasized about her, she was completely shocked and taken aback, because nothing like that had happened to her before and she did not know how to react. At that point, the telephone rang. The call was from her mother, who wanted to know when she would be coming home. The call gave Kaitlyn M. an excuse to leave. She testified, however, that following a period of awkward silence interrupted by the defendant's sporadic comments about his fantasies and how uncomfortable she looked, she barely could move. Finally, the defendant grabbed her head with his hands and kissed her hard on the cheek. As she stood up to leave, the defendant again grabbed her head, but this time he kissed her on the lips and attempted to force his tongue into her mouth. He also told her: "I love you in ways that you can't understand." Kaitlyn M., terrified and confused, pulled away and headed to the door. The defendant reached

out, took her bag and said he would carry it to her car, which he never had done before. When they reached the car, he blocked the driver's side door and told her again that he loved her in ways that she could not understand. He also told her that he trusted her to keep their conversation private. He then allowed her to enter her car and drive away.

Kaitlyn M. did not tell anyone about what had happened until the next day at school when she confided in her best friend. She also told her soccer coach, who notified the school and her parents. When Kaitlyn M. confronted the defendant during a telephone call the following week, he apologized and described the incident as a misunderstanding. Kaitlyn M. stopped taking private lessons with the defendant but remained on the team because it was college recruitment time and she wanted to play division I softball in college. She also remained because the defendant was not coaching her age level and her parents promised that she never again would be alone with him. Kaitlyn M.'s coach, however, subsequently left the Express and the defendant took over. Only after Kaitlyn M. had an argument with the defendant at the Florida tournament during the summer of 1999 and revealed the incident to the other Express players, did Sarah S., Julia S. and Kristin C. come forward and describe their own experiences with the defendant. The defendant subsequently was charged with sexual misconduct by way of three separate informations, each pertaining to a different victim. Although he admitted that he was a "touchy-feely" person and that giving softball lessons involved a lot of physical contact between player and coach, the defendant denied all of the allegations against him in the three informations.

## II

## MOTION IN LIMINE

We first address the defendant's claim that the trial court improperly denied his motion in limine to exclude evidence of allegations made by Julia S., Kristin C. and Kaitlyn M. from Sarah S.'s case in order to establish a common plan or scheme on the part of the defendant to sexually abuse the girls he met through his position as a softball coach.[10] The defendant argues that the trial court's decision allowed the state to introduce prejudicial evidence into Sarah S.'s case, even though she did not fit into the purported plan or scheme.

The defendant specifically argues that the testimony of Julia S., Kristin C. and Kaitlyn M. did not constitute relevant evidence of a common plan or scheme because it was not similar to the testimony of Sarah S. The defendant contends that the incidents involving Sarah S. differed in frequency and severity from those involving the other girls and that Sarah S. was not similarly situated because he did not coach her and because she did not view him as a confidant. The defendant finally contends that the admission of the disputed testimony was highly prejudicial because it unduly aroused the jury's emotions and constituted, in effect, bad character evidence. We agree with the defendant that the trial court improperly denied the motion in limine to exclude the testimony of a purported common plan or scheme in Sarah S.'s case.

The defendant filed a motion in limine seeking to "exclude as evidence in the trial of [Sarah S.] any testimony or other evidence from any witnesses on direct or cross-examination concerning any crimes, acts, misconduct or wrongdoing of the defendant other than the

[10] The defendant did not file similar motions in the cases involving Julia S. or Kristin C., which had not yet been consolidated for trial with the case of Sarah S.

instant offense with which the defendant [was] charged." The trial court heard argument on the motion, at which time the state made an offer of proof[11] and the defendant objected,[12] except with respect to the

---

[11] In its offer of proof, the state argued in relevant part: "It's through that contact with these girls that he—it's a common plan or scheme . . . . It's the state's contention . . . that his contact with these girls all is similar, in that he approaches first as coach, he gets exposure to them through coaching, then becomes a confidant, becomes almost someone that they look up to. Each one of them will testify, with the exception of Sarah S., that they think he's the best coach they ever had. To this day, after all that's gone on, they still say he's the best coach they ever had and actually it's more hurtful to them that this happened because they looked upon him as more [than] just a coach. The pattern was almost—two of them will say a second father. And to have this happen is why they're so traumatized by it all. From someone that they held so dear, someone that they held so close, someone they spent so much time with. You'll hear testimony that it wasn't just constant practice as a team. It was weekly individual lessons for these young ladies. And they had individual exposure to [the defendant] and over time contact became something that they were uncomfortable with."

The state later added: "It's constant talk . . . that's the pattern. It's talk first with the base line conduct done in public. Then it is beyond. The talk becomes more suggestive, more sexually explicit. Then it becomes hands on touching where the girls feel like it's gone beyond even what they were used to. That's when the inappropriateness takes place. He takes advantage of the relationship that he forges with these girls as a confidant. That's the common link here . . . ."

[12] Defense counsel, referring to the proposed testimony of Kaitlyn M. regarding uncharged misconduct, argued in relevant part: "I do not think . . . that that type of conduct is sufficient for pattern or would be sufficient to meet that standard. And the prejudice would be gross. It would be a jury being presented with the fact that whenever he gets the opportunity, whenever he sees the type of victim he goes in for the kill and gets confiden[ce] in them and tries to kiss them and then he goes on to the next stage.

"There's no evidence with Kaitlyn M. that he went on to any next stage. . . . I can't let a jury stand up there and think, aha, well we already heard from four witnesses and all four of these people—well I guess that must be it. I don't see anybody else that he coaches coming up and defending his actions that they don't feel uncomfortable and that this is the way that he normally acts, that he responds to . . . the confidence of the girl, responds to the question, is a very good coach. [I've] got to present that there is another side. . . . I don't think that there is sufficient evidence of a pattern . . . .

"When you look and read the allegations . . . of [Kristin C., Julia S. and Kaitlyn M.] . . . first of all I don't think it's a pattern and second of all the

testimony of Sarah S. regarding the uncharged Florida misconduct. The court held that the common scheme evidence was admissible, stating: "This is clearly not an easy call. It seems to me that we clearly are dealing with one of the exceptions about uncharged conduct and common practice or scheme. Then we get to the two prong [test] which requires it be relevant [and] material to at least one of the circumstances. It clearly meets that [test]. The second prong is the probative value of such evidence must outweigh its prejudicial effect. I think that clearly has been established here. That it [has] probative value of a pattern scheme which shows that he has to prove a pattern of criminal activity involving common young women, common organizational links. *With the exception of the instant accuser in this case,* common conduct. *In this case it went further. . . .* To the extent that [counsel for the defendant] has a motion [in limine to exclude testimony from Kaitlyn M., Julia S. and Kristin C.] the motion is denied." (Emphasis added.)

"The rules governing the admissibility of evidence of a criminal defendant's prior misconduct are well established. Although evidence of prior unconnected crimes is inadmissible to demonstrate the defendant's bad character or to suggest that the defendant has a propensity for criminal behavior . . . such evidence may be admissible for other purposes, such as to prove knowledge, intent, motive, and common scheme or design, if the trial court determines, in the exercise of judicial discretion, that the probative value of the evidence outweighs its prejudicial tendency." (Citations omitted; internal quotation marks omitted.) *State* v. *Morowitz*, 200 Conn. 440, 442, 512 A.2d 175 (1986). "That evidence tends to prove the commission of other crimes by the accused does not render it inadmissible

prejudice in the minds of the jury is too great. It prevents my client from getting a fair trial. Even if I do bring in witnesses until the court says stop."

if it is otherwise relevant and material . . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Citations omitted; internal quotation marks omitted.) *State* v. *Hauck*, 172 Conn. 140, 144, 374 A.2d 150 (1976).

"When evidence of prior misconduct is offered to show a common plan or design, the marks which the [earlier] and the [present] offenses have in common must be such that it may be logically inferred that if the defendant is guilty of one he must be guilty of the other. . . . It is not enough that the two offenses are similar. To establish a common design, the characteristics of the two offenses must be sufficiently distinctive and unique as to be like a signature." (Citation omitted; internal quotation marks omitted.) *State* v. *Morowitz*, supra, 200 Conn. 443. There is a greater liberality, however, "in admitting evidence of other criminal acts to show a common scheme, pattern or design in sex-related crimes. . . . Evidence of another sex offense is admissible to show a common scheme or plan if the offense is proximate in time, similar to the offense charged, and committed with persons similar to the prosecuting witness. . . . Admissibility lies within the sound discretion of the trial court . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Hauck*, supra, 172 Conn. 145.

We have had occasion in two other cases to consider whether evidence purporting to prove a common plan or scheme is admissible when a defendant uses his position of superior authority to take sexual advantage of a female victim with whom he has a professional relationship. In *Hauck*, the defendant was a junior high school science teacher who took nude or semi-nude

photographs of the minor female victim, his student, in exchange for giving her a grade of C in science. Id., 141–42. At trial, the state was permitted, over the defendant's objection, to present the testimony of a female witness, who also had been the defendant's student, to prove a common scheme. Id., 143. Both students were under the age of sixteen at the time of the incidents. Id. The witness testified that, during the same school year and the same period of time, the defendant, who was her science teacher, requested at least five times that she come to his desk to look at some papers, placed his leg between her legs while she was at the desk and, on one such occasion, placed his hand on her thigh. Id. She further testified that the defendant told her at the end of her seventh grade year that, if she stayed after school every day, he would give her a passing grade as long as she consented to his touching her in that manner. Id. This court concluded that the trial court did not abuse its discretion in admitting the testimony of the witness because "the state's claim that there was a common scheme or design was based upon the fact that both crimes, the one before the court and the one not charged in the information, involved a teacher using his position of authority to obtain or to seek to obtain sex-related favors in return for a passing grade in his science course; that the acts in both instances took place during the lunch hour or after school in the defendant's science classroom after a minor female student had come to the defendant for extra work to obtain a better grade; and that these incidents were occurring at frequent intervals during approximately the same period of time." Id., 146–47.

In *Morowitz*, we considered a similar issue. The defendant podiatrist, who was accused of sexually assaulting a sedated female patient, objected to the admission of testimony by the victim of a nearly identical sexual assault three years earlier. *State* v. *Morowitz*,

supra, 200 Conn. 442. The defendant had instructed the victim and the witness, both of whom were young married women, to take a tranquillizer one half hour before coming to his office for foot surgery, remove their street clothes, put on a surgical gown over their underwear, sit on a reclining chair in the defendant's treatment room and take an injection of valium. Id., 443–444. Both women fell asleep, only to find, when they awoke, that the defendant was engaging in sexual intercourse with them and that no one else was in the office. Id. We concluded that "the defendant exploited his professional position to isolate, sedate, and assault young female patients who were rendered incapable of resisting by the use of tranquilizing drugs." Id., 445.

More recently, the Appellate Court held in an analogous case that the trial court did not abuse its discretion when it permitted three witnesses to testify regarding a common plan or scheme on the part of the defendant, an owner and operator of horseback riding stables, to assault several women who worked for him. See *State* v. *Johnson*, 76 Conn. App. 410, 819 A.2d 871, cert. denied, 264 Conn. 912, 826 A.2d 1156 (2003). The court determined that the common denominators in the testimony of all three witnesses and the victim were that "[e]ach witness alleged incidents that took place at the defendant's stables, all the incidents involved the defendant, all the incidents involved women being approached from behind while they were unaware and engaged in work,[13] each witness alleged that the defen-

---

[13] At the time of the incident, the victim testified that she was engaged in moving a horse from a trailer. See *State* v. *Johnson*, supra, 76 Conn. 417. The first witness reported that two incidents had occurred, one while cleaning her horse's hoof in the stables and the other while inside a barn. Id. The second witness reported one incident that took place inside the defendant's house while she was chopping vegetables for a salad. Id. The third witness reported two incidents—the first happened while she was cleaning her horse's hooves in the stable and the second while she was inside the defendant's house showing him pictures of a horse show. Id.

dant had grabbed their buttocks, in all cases the contact was unsolicited, and in all cases the contact was a prelude to further sexual advances" that ranged from attempting to kiss the witnesses to grabbing the victim's breast. Id., 417–18. Furthermore, "[i]n each case, the testifying witness was a woman in a professional relationship with the defendant: Two were students, and one was an employee. In all [three] cases, the defendant was in a position of professional authority superior to the witness," as in the case of the victim. Id., 418.

The present case is distinguishable from *Hauck, Morowitz* and *Johnson*. Although the defendant's abuse of Julia S., Kristin C. and Kaitlyn M. was proximate in time to his abuse of Sarah S., there were few similarities between his abuse of Sarah S. and his abuse of the other girls. See *State* v. *Hauck*, supra, 172 Conn. 145. Furthermore, Sarah S.'s relationship with the defendant differed in several important respects from his relationship with the other girls. Accordingly, we conclude that the trial court improperly denied the defendant's motion in limine to exclude the testimony of Julia S., Kristin C. and Kaitlyn M. from Sarah S.'s case.[14]

We begin with the first prong of the test, namely, that evidence of a sex offense is admissible to prove a common plan or scheme if the offense is proximate in time to the charged offense. See id. The defendant's abuse of Sarah S. commenced in the fall of 1995 with his request for phone sex and the incident in the kitchen. The defendant engaged in three subsequent incidents of charged misconduct involving Sarah S. in the fall of 1996 and in the summer of 1997 and two final incidents

---

[14] We note that although the charged and uncharged misconduct involving Kristin C. and Kaitlyn M. took place after the charged offenses relating to Sarah S., "[w]here evidence is relevant to show a common plan or an unusual technique used to commit a crime, we see no reason to exclude it simply because the acts of the defendant involved occurred subsequent to the crime being tried." *State* v. *Nardini*, 187 Conn. 513, 519, 447 A.2d 396 (1982).

of uncharged misconduct in the summer of 1998. The defendant's abuse of Julia S., Kristin C. and Kaitlyn M. took place in the early and latter months of 1998 and in the spring of 1999. Accordingly, the defendant's abuse of Julia S., Kristin C. and Kaitlyn M. was not too remote in time to be considered part of a common plan or scheme in Sarah S.'s case.

The defendant's abuse of Sarah S., however, was far more frequent and severe. Sarah S. testified that seven incidents of charged and uncharged misconduct occurred inside her home or in the bedroom of her Florida residence during the softball tournament when no other person was present to observe the defendant's behavior. Moreover, the incidents involved a wide range of misconduct, including: (1) "talking dirty" on the telephone and attempted phone sex; (2) multiple incidents of touching her breasts, thighs and in between her legs; (3) masturbating and ejaculating in her presence; (4) attempting to force her to perform oral sex; (5) attempting to force his tongue into her mouth; (6) digital penetration; (7) attempting to climb on top of her while she was lying in bed; and (8) repeated requests that she "pleasure" him.

In contrast, there was one incident of abuse involving Julia S., two involving Kristin C. and one involving Kaitlyn M. Each took place at the Ansonia facility after a private lesson and all except one occurred in the vicinity of other persons.[15] Furthermore, the abuse was less severe. In the cases of Julia S. and Kristin C., the defen-

---

[15] The incident with Julia S. occurred in the defendant's office doorway while her father was only a few feet away making a telephone call. The first incident with Kristin C. occurred while she and a friend were wrestling with the defendant in the vicinity of his office. The second incident took place in the cafeteria of the Ansonia softball facility with several other persons sitting nearby. The only incident where the defendant was alone with the victim involved Kaitlyn M. and took place in the defendant's office and the parking lot at the Ansonia facility.

dant grabbed and fondled the victims' breasts. In the case of Kaitlyn M., the defendant made sexual comments, touched her leg and kissed her. He also attempted to force his tongue into her mouth and told her that he loved her in ways that she could not understand. None of this abuse, however, was nearly as extreme as the defendant's abuse of Sarah S., a fact expressly noted by the trial court.

The difference between the defendant's abuse of Sarah S. and his abuse of the other girls is reflected in the three informations.[16] The abuse of Sarah S. resulted in a ten count information that included one count of attempted sexual assault in the first degree. The abuse of Julia S. and Kristin C. resulted in a three count and four count information, respectively, neither of which included a charge of attempted sexual assault in the first degree.[17] Kaitlyn M. chose not to bring charges against the defendant. Accordingly, we conclude that, although the defendant's abuse of Julia S., Kristin C. and Kaitlyn M. bore some similarities, it had very little in common with his abuse of Sarah S.

We also conclude that the defendant's relationship with Sarah S. differed in several key respects from his relationships with the other girls. Sarah S. took one private lesson with the defendant and the two became

---

[16] At the time the defendant filed the motion in limine to exclude evidence of other misconduct from Sarah S.'s case, the three cases had not yet been consolidated for trial. Only after the court denied the motion in limine did the state make an oral motion to consolidate the cases, which the trial court granted over the defendant's objection.

[17] The charges brought as to Sarah S. included one count of attempted sexual assault in the first degree, three counts of sexual assault in the fourth degree, five counts of risk of injury to a child and one count of harassment in the second degree. The defendant's misconduct toward Julia S. resulted in a three count information that included one count of sexual assault in the fourth degree and two counts of risk of injury to a child, one of which was nolled. The four count information in Kristin C.'s case included two counts of sexual assault in the fourth degree and two counts of risk of injury to a child.

further acquainted because of his frequent telephone calls to her father and visits to her home to instruct Express players. In addition, Sarah S. sold T-shirts at softball competitions. Nevertheless, Sarah S., unlike the other girls, was not a member of an Express softball team, did not have frequent and continuous contact with the defendant as a player, did not take weekly private lessons with the defendant over a period of several years, did not develop a close personal relationship with the defendant and did not regard him as a confidant. Even more significantly, she did not feel compelled, as did the other girls, to cultivate or continue a relationship with the defendant following the abuse because of his ability to assist her in obtaining a college softball scholarship. Therefore, it cannot be inferred logically that, if the defendant was guilty of the charged and uncharged offenses involving Julia S., Kristin C. and Kaitlyn M., he also must have been guilty of the charged offenses involving Sarah S. See *State* v. *Morowitz*, supra, 200 Conn. 443.

The state argues that the trial court properly admitted evidence in Sarah S.'s case to prove a common plan or scheme because all of the girls were young teenagers to whom the defendant had gained access through his position as a softball coach. The state also argues that all of the girls testified to a strikingly similar progression of sexual abuse, from sexual comments to physical conduct. The state concedes that the defendant's abuse of Sarah S. was more frequent and severe than his abuse of the other girls, but it argues that the misconduct evidence offered in support of a common plan or scheme need only be similar to the charged misconduct for the logical inference to be made that, if the defendant is guilty of one, he must be guilty of the other. The state thus contends that the charged and uncharged misconduct do not have to be identical acts, but only similar enough "to justify the conclusion that [the

charged conduct] is at least a reasonable facsimile of the prior incident[s]." (Internal quotation marks omitted.) *State* v. *Madore*, 45 Conn. App. 512, 522, 696 A.2d 1293 (1997); see also *State* v. *Hauck*, supra, 172 Conn. 145; *State* v. *Hart*, 26 Conn. App. 200, 203, 599 A.2d 748 (1991). We are not persuaded.

The state relies on *State* v. *Hart*, supra, 26 Conn. App. 200, a case in which the victim testified as to four incidents of sexual intercourse with the defendant and the court permitted the witness to testify as to "numerous" acts of sexual intercourse with the defendant as evidence of a common plan or scheme. Both the victim and the witness were fourteen years old at the time of the abuse. Id., 201–202. In concluding that the trial court properly admitted the testimony of the witness, the Appellate Court held that there were far more similarities than dissimilarities between the uncharged misconduct testimony and the testimony of the victim. Id., 203. *Hart*, however, is inapposite in the present case because a comparison of the defendant's abuse of Sarah S. to his abuse of the other girls discloses many more differences than similarities.

The state's reliance on *Hauck* also is misplaced. In that case, in which the charged and uncharged misconduct were deemed sufficiently similar to prove a common scheme, the defendant took nude photos of the victim, but merely touched the thigh of the witness. See *State* v. *Hauck*, supra, 172 Conn. 143. The state overlooks the fact that the victim and the witness in *Hauck* had the same relationship with the defendant because both were his students. Moreover, the key element of misconduct common to both situations was the bargain that the defendant struck with each of the girls to grant him sexual favors in exchange for a passing grade. That the sexual favors differed in kind was not as significant as the fact that the defendant used his position of authority to extract the bargain and that the

relative severity of the misconduct he perpetrated in both situations, while not identical, was more or less equivalent.

In the present case, Sarah S. was not similarly situated to the other girls because she was the only girl who was not coached by the defendant. She also was subjected to a type of abuse that was qualitatively different from that of the other victims. Accordingly, the two principal cases cited by the state do not support its contention that the similarities in the defendant's treatment of Sarah S. and his treatment of the other girls sufficiently outweighed the distinctions so as to favor the admission of common scheme evidence in Sarah S.'s case.

Moreover, we are not persuaded that the evidence of prior misconduct should be admitted because of any possible similarity between the defendant's early abuse of Sarah S. and his abuse of the other three girls. See *State* v. *Kulmac*, 230 Conn. 43, 63, 644 A.2d 887 (1994) (common scheme testimony by witness admissible when defendant's early abuse of witness is similar to abuse of victim). In *State* v. *James G.*, 268 Conn. 382, 844 A.2d 810 (2004), we determined that evidence of prior misconduct was admissible where early acts of abuse against the state's principal witness, the victim's half-sister, whom the defendant had abused for nearly eight years, resembled in both character and frequency the alleged acts of abuse perpetrated against the victim, whom the defendant had abused for less than one year. In both cases, the children were six or seven years old at the time of the initial abuse and were subjected to numerous incidents of vaginal touching on a weekly basis. Id., 393.

In the present case, unlike in *James G.*, the defendant's early abuse of Sarah S. was not similar in kind

to his limited acts of abuse against the other three girls.[18] The initial abuse of Sarah S. consisted of the phone sex incident and the encounter in the kitchen, in which the defendant grabbed her breasts and proceeded to move his hands down her body, over her thighs, underneath her skirt and in between her legs. In contrast, the abuse of Julia S. and Kristin C., while also highly offensive, was nonetheless restricted to contact with their breasts.[19] In the case of Kaitlyn M., the defendant touched her knee, kissed her several times and attempted to force his tongue into her mouth. None of this behavior can be considered equivalent to the early abuse of Sarah S., which included extensive touching of her body. In addition, Sarah S. was not similarly situated to the other three girls because the defendant was not her coach. In *James G.*, the witness and the victim had comparable relationships with the defendant as his stepdaughter and natural daughter, respectively. Id., 386 n.8, 393; see also *State* v. *Kulmac*, supra, 230 Conn. 63 (common scheme testimony admitted where defendant had close relationship with both witness and victims).

Furthermore, there was no indication that the defendant's abuse of the Express players was a prelude to further misconduct. The defendant did not engage in additional acts of abuse against Julia S. and Kaitlyn M. following the episodes in which they were involved. Nor did he continue to abuse Kristin C. following the two incidents she described to the team, which occurred within a relatively short period of time. All of

[18] We note that, although the court in *James G.* compared the defendant's early abuse of the witness with his abuse of the victim, whereas this court is comparing the defendant's early abuse of the victim with his abuse of the witnesses, the same analytical principles apply in determining the admissibility of the common scheme evidence.

[19] Our conclusion that there was a significant difference in the defendant's abuse of Sarah S. and his abuse of the other girls is not intended to diminish the degrading and ultimately harmful effect of his misconduct on all four victims.

the incidents involving the players occurred within four to eighteen months prior to the Florida tournament, when the defendant's misconduct came to light and the girls shared their experiences during a group discussion of the matter. Following his abuse of Julia S., Kristin C. and Kaitlyn M., the defendant had sufficient opportunity to engage in additional misconduct with each of the girls, but did not do so. Accordingly, a comparison of the defendant's initial abuse of Sarah S. and his abuse of the other girls reveals insufficient similarities to weigh in favor of admitting the prior misconduct evidence in the case involving Sarah S.

Although we conclude that the trial court improperly denied the defendant's motion to exclude the evidence of other misconduct, we also must determine whether the trial court's decision was harmful. "In a case involving an evidentiary ruling, it is the defendant's burden to show that it is more probable than not that the court's action affected the result. . . . Some degree of prejudice inevitably accompanies the admission of evidence of a defendant's other misconduct." (Citations omitted; internal quotation marks omitted.) *State* v. *Faria*, 47 Conn. App. 159, 175, 703 A.2d 1149 (1997), cert. denied, 243 Conn. 965, 707 A.2d 1266 (1998); see also *State* v. *Sierra*, 213 Conn. 422, 436, 568 A.2d 448 (1990).

The following additional facts are necessary to the proper resolution of this issue. After denying the motion in limine, the court granted the plaintiff's motion to consolidate the three cases for trial. At trial, the first witness to testify was Kaitlyn M. The court introduced her testimony by explaining to the jury that Kaitlyn M.'s testimony was being admitted as evidence of a common plan or scheme.[20]

---

[20] The court instructed the jury as follows: "The state is about to offer evidence of prior acts of misconduct . . . of the defendant and he is not being charged with that misconduct. It's not being admitted to prove the bad character of the defendant or his tendency to commit criminal acts. Such evidence is being admitted solely to show or establish a method, plan or scheme in the commission of the criminal acts. . . .

Thereafter, prior to the testimony of Sarah S., defense counsel requested that the court advise the jury that a portion of Sarah S.'s testimony also would be admitted as evidence of a common plan or scheme. The court agreed to repeat the comments it made prior to the testimony of Kaitlyn M. and explained to the jury that the testimony of Sarah S. regarding the uncharged Florida misconduct would be admitted for a similar purpose.[21] In its final instructions to the jury, the court again advised the jury that it could consider the testimony of Kaitlyn M. and the testimony of Sarah S. concerning the Florida incidents as evidence of a common scheme.[22] The court charged: "The . . . evidence was

"You may consider such evidence as establishing a predisposition on the part of the defendant to commit any of the crimes charged or to demonstrate a criminal propensity. You may consider such evidence if you believe it and further find it logically, rationally and conclusively supports the issue for which it is being offered by the state, namely, that [the defendant] used his coaching position to gain access to young women in a vulnerable position."

[21] The court specifically advised: "I would like to refresh your memory as to something I talked to you yesterday about called uncharged misconduct, the conduct that is not the subject of criminal charges here, but which the state is allowed to introduce to establish a method, plan or scheme in the commission of the criminal acts that are charged here. This next witness is going to testify . . . about one or more occurrences in the state of Florida. Those are uncharged misconduct. And the only thing you can use them for is evaluating whether there was a plan or scheme involved and we defined that for you yesterday as . . . [the defendant using his] coaching position to gain access to young women in a vulnerable position."

[22] The court also charged: "During the presentation of this case you have heard testimony concerning an incident involving Kaitlyn [M.]. Remember that the charges you are to decide only relate to and involve charges involving Sarah [S.], Julia [S.] and Kristin [C.]. You may not convict the defendant upon any acts involving Kaitlyn [M.]. Similarly, you have heard evidence concerning incidents which allegedly occurred in Florida. Remember that the charges you are to decide relate only to the allegations of acts occurring in Connecticut. You may not convict the defendant of any acts which allegedly occurred in Florida.

"Evidence of the incident involving Kaitlyn [M.] and the evidence of acts which allegedly occurred in Florida may only be used for a limited purpose and were offered only to show a common scheme or pattern of criminal activity. The defendant is not charged with any crimes or misconduct involving Kaitlyn [M.] nor is he charged with any crimes or misconduct which occurred in Florida. The testimony concerning those incidents is not offered for, and cannot be used to show, that the defendant has a propensity to

offered by the state claiming that there are sufficient similarities in the uncharged conduct and the conduct with which the defendant is charged as to indicate that this was a unique way or technique, like a signature or a fingerprint, of the way this defendant did things. It's up to you to determine whether or not you believe the testimony of Kaitlyn [M.] and Sarah [S.], Julia [S.] and Kristin [C.], and it is up to you to determine whether there was sufficient similarity in what supposedly was done with each of these people to draw conclusions about whether the defendant committed the charged offenses. If you find the testimony concerning these incidents credible, and you find that the defendant's conduct in these incidents is sufficiently similar to the charged crimes, then you may only use this evidence as evidence of a pattern or course of conduct by the defendant.

"On the other hand, if you find that the evidence concerning the uncharged conduct is not credible, that the defendant's actions did not constitute misconduct or that these uncharged incidents are not similar to the charged crimes to create a pattern [or] course of criminal conduct, then you should disregard this evidence and not use it as a basis for your decision."

In the present case, the testimony of Julia S., Kristin C. and Kaitlyn M. was potentially prejudicial to the defendant in Sarah S.'s case and we cannot conclude that it was harmless. "Any improper evidence that may have a tendency to excite the passions, awaken the

commit a crime or that because he may have committed some similar act he must have committed the charged misconduct.

"You are to weigh the testimony and evidence concerning [Kaitlyn M.'s] allegations and the Florida allegations like you would any other testimony or evidence. Even if you accept all of this testimony and you find that the defendant engaged in the misconduct with Kaitlyn [M.] or that he engaged [in] the misconduct with Sarah [S.] in the state of Florida, you must not use this testimony as evidence of the defendant's criminal disposition."

sympathy, or influence the judgment, of the jury, cannot be considered as harmless." (Internal quotation marks omitted.) *State* v. *Faria*, supra, 47 Conn. App. 175. The trial court's instructions to the jury as to a common plan or scheme did not, and could not, cure the potential prejudice to the defendant. In advising the jury that it could consider the testimony of all four girls as evidence of a common scheme, the court permitted the jury to be influenced by evidence that was not relevant or material to the issues in Sarah S.'s case. That the defendant's abuse of the other girls was not as severe as his abuse of Sarah S. does not mean that the evidence of such abuse was harmless. The sheer quantity of testimony concerning the defendant's abuse of the other girls was likely to have been harmful in its cumulative effect upon the jury's deliberations. Even making every reasonable presumption in favor of upholding the trial court's ruling, we must conclude that the trial court improperly denied the defendant's motion to exclude the purported evidence of a common scheme from Sarah S.'s case. Consequently, the trial court's judgment must be reversed in the case involving Sarah S. and the defendant afforded a new trial.

### III

### MOTION FOR CONSOLIDATION

We next address the defendant's claim that the trial court improperly consolidated the case of Sarah S. with the cases of Julia S. and Kristin C. because the facts of the former case were much more shocking and violent than the facts of the latter two cases. The defendant argues that the trial court's ruling to consolidate the cases contaminated the jury's consideration of the less serious charges involving Julia S. and Kristin C., thereby impairing his right to a fair trial. He also argues that the court's instructions were inadequate to remedy the resulting prejudice. He contends that the court never

instructed the jury to consider each case separately or advised the jury that a finding of guilt in one case should not influence its decisions in the other two cases.

The state responds that the defendant's abuse of Sarah S. was not unusually violent and shocking when compared with his abuse of Julia S. and Kristin C., and that where evidence of one incident can be admitted at the trial of another to show a common scheme, separate trials would provide the defendant with no significant benefit. We conclude that the trial court improperly joined the three cases for trial and that the court's instructions to the jury were insufficient to cure the substantial prejudice to the defendant that resulted from the improper joinder.

The following additional facts are necessary to our resolution of this issue. Immediately after the trial court denied the defendant's motion in limine, the state orally moved to consolidate the cases of Sarah S., Julia S. and Kristin C. for trial. The state argued that in light of the fact that the testimony of Julia S. and Kristin C. would be admitted as evidence of a common plan or scheme in Sarah S.'s case, the court should consolidate the cases in the interest of "judicial economy" and to "put everything in front of one jury at one time." Defense counsel objected, arguing that consolidation in effect would constitute a waiver of his objection to the admission of testimony in Sarah S.'s case regarding other misconduct on the part of the defendant and would remove any appellate issue on that matter. Defense counsel added that the defendant also would be prejudiced if the cases were tried together because the number of counts against him would be significantly greater and there was insufficient time to prepare.

The court initially denied the motion to consolidate the cases, but continued to discuss the matter with counsel. The court subsequently reversed its position

and overruled the defendant's objection, granted the state's motion to join the cases and scheduled additional time for defense counsel to prepare for trial on the consolidated charges. The defendant filed a motion for articulation, which the trial court denied. This court subsequently granted the defendant's motion for review, but denied the relief requested.

The trial took nine days over the course of approximately two months and included the testimony of nineteen witnesses. The court commenced the evidentiary portion of the trial by requesting that the clerk read to the jury[23] the information as well as the seventeen counts. In its opening remarks, the court spoke of the jury's responsibilities and of the specific charges against the defendant: "Each charge against the defendant is set forth [in] the information in a separate paragraph or count, and each offense charged must be considered separately by you in deciding guilt or innocence of the defendant. In other words, it is entirely possible for you to vote for acquittal on one charge and guilt on another.

"While there are seventeen charges or counts brought against [the defendant] there are not seventeen separate instances. Some facts have resulted in more than one charge. In [these] cases there are nine separate occurrences or fact patterns."

Following the testimony but prior to closing argument, the defendant filed the following supplemental request to charge: "As you are aware, the defendant is charged with a number of offenses involving three separate individuals. Each charge against the defendant is set forth on the information in a separate paragraph or count, and even though these charges have been tried together, each offense charged must be considered

[23] The clerk read as follows: "Ladies and gentlemen of the jury, the accused has been charged with the following information: CR99-0113814-S, CR99-0113815-S, CR99-0152870-S, State of Connecticut versus Robert Ellis . . . ."

separately by you in determining the guilt or innocence of the defendant, and you must make a separate decision as to each offense charged."

The next day, defense counsel suggested that the court submit the case to the jury in the form of three informations to emphasize the fact that there were three separate cases.[24] The court replied that, because the cases had been presented to the jury in the form of a single information, the court would not change course so far along in the proceedings.

The state began its closing argument by referring to the fact that "[t]his case, although seemingly complex, is really very simple. What it involves is three victims. Three victims, four alleged victims. Three are charge[d],

[24] "[Defense Counsel]: [W]e were thinking about the fact that maybe the jury should get—when it gets the informations, three informations, with each one with the docket number as it applies to the three different— because there are three different cases here. I know they've been combined, but these are three separate charges with three separate docket numbers and if they get three different informations, [as] I had argued at the beginning, your Honor, the prejudice of dumping seventeen charges on the jury. It's still going to be seventeen charges, but at least it will allow the jury to realize it's three separate cases.

"The Court: I know where you're coming from in terms of a strategy, but in terms of mere procedure, I consolidated the cases into one.

"[Defense Counsel]: But they're still separate. Even when you consolidate something they're still separate files. I'm only going back in a civil case, your Honor. If you consolidate the cases they still give two jury forms. One for each case.

"[The Prosecutor]: I've never seen it here. We consolidate cases all the time. I think what the Practice Book calls for is [for] me to have a copy of the consolidated charge in each of the three clerk's files from the two from [geographical area number five] and the one from [geographical area number two]. And that's something I could do. Each particular clerk's file will have a copy of the updated charge with all of the charges and the three docket numbers. I think that's the only thing I'm required to do. I think to split them up after they've been consolidated—I think we're just trying to do a little—

"The Court: The other thing is we read it to them. I'm not going to change what we gave them. If we hadn't yet, if we were at the beginning it might have been another issue. But we already read it to them as being the charge."

so there's only three victims to which the charges that you're going to have to decide guilt or innocence on pertain." The state continued by describing each of the victims and the abuse to which they had been subjected. During its remaining argument, the state discussed the seventeen charges and nine incidents by grouping them into categories.[25]

The state urged the jury to consider the defendant's guilt as an all or nothing proposition, meaning that he was either guilty or not guilty of all of the charges: "[I]f you decide that [the defendant] is telling the truth and has told the truth throughout, you've got to acquit him, not guilty count one through seventeen. If he's telling you the truth and you think he's telling you the truth he didn't do anything wrong. . . . One through seventeen if you believe them. If you believe him, he's not

[25] The state began this portion of the argument by asking the jury: "Now, what are we going to do about these charges? Seventeen charges. . . . That's a lot of charges. But they're really—of the seventeen charges you'd have to decide on, there are nine incidents. Seventeen charges really boil down to nine incidents. Five relating to Sarah [S.], two related to Kristin [C.] and two related to Julia [S.]."

The state then explained that the first twelve charges arose from six incidents of touching, two involving Kristin C., one involving Julia S. and three involving Sarah S. The state further explained that there were six charges of sexual assault in the fourth degree and six charges of risk of injury to a child. The state concluded: "They all relate to six specific incidents, the incidents of touching: kitchen, laundry room, laundry room, taping lesson, wrestling, patting."

In describing the conduct required to meet the statutory criteria, the state stated: "It has to be sexual and indecent. . . . These are teenage girls, he's their coach or he's their family friend.

"Once again, the film session, the wrestling, the taping, kitchen, laundry room and laundry room. Six more counts. We're up to twelve. Seventeen charges are nine incidents. We've covered six incidents and twelve charges. It's the touching and the risk of injury likely to offend the morals by the touching."

The state next described the five remaining counts as arising from three incidents: the harassment charge arising from the phone sex incident and the risk of injury charges arising from "the phone call, the couch incident and the incident in the office. What do we have to show here? I have to show you that they're under sixteen."

guilty." The state concluded its argument with similar advice: "If you believe the testimony of Julia [S.], Kristin [C. and] Sarah [S.], then this man is guilty of seventeen crimes . . . . If you believe these girls and you disbelieve him, he's guilty of all of them." During rebuttal argument, the state again urged the jury: "[I]f you believe those facts to be true, the man is guilty of seventeen counts. He's guilty of every single count." The defendant did not object to any of these comments.

In its instructions to the jury, the court described the allegations contained in each count of the information and the defendant's response to the allegations. The court also described each of the incidents of uncharged misconduct involving Kaitlyn M. and Sarah S. The court continued: "You should note that the defendant is charged in 'counts'. That is legal language for saying that the accused is charged with committing seventeen separate offenses or crimes. Each count alleges a separate crime, joined for convenience of trial in one formal charge or 'information.'

"It will be your duty to consider each charge or count separately, and when you return to the courtroom you will be asked whether or not the accused is guilty as charged in each of the counts, and you will render your verdicts accordingly. Your verdict form requires you to provide a decision on each of the seventeen counts.

"This is the verdict form which you will be given and it recites the count and then has a line for guilty, a line for not guilty. You'll render seventeen different answers, and at the end, after you're completed, your foreperson will sign, print his or her name and date the document. . . .

"When you go to the jury room to deliberate on the evidence in this case, you should ask yourselves this question: Am I convinced beyond a reasonable doubt of [the defendant's guilt as charged] in each count of

the information as you consider that count of the information. If you are so convinced you will convict him, but if you have a reasonable doubt as to his guilt you will give him the benefit of that doubt and find him not guilty. You must go through that questioning and evaluation process with each count. You're not allowed a blanket verdict. You must consider and render a verdict on each count separately. . . .

"If you're unable to arrive at a unanimous verdict on any given count you must bring that to my attention before you advise [me] of your verdicts on the other counts. The way you do that is you write a note signed by the foreperson, giving it to the marshal, which advises me that you are unable to arrive at a unanimous verdict on a specific count. . . . We deal with the problem first and then go back and handle the others later on." Following the instructions, the court acknowledged that, to the extent that it had not complied with defense counsel's requested instructions, the defendant could be considered as having taken exception to the jury charge.

General Statutes § 54-57 provides: "Whenever two or more cases are pending at the same time against the same party in the same court for offenses of the same character, counts for such offenses may be joined in one information unless the court orders otherwise." See also Practice Book § 41-19. This court has recognized, however, that improper joinder may expose a defendant to potential prejudice for three reasons: "First, when several charges have been made against the defendant, the jury may consider that a person charged with doing so many things is a bad [person] who must have done something, and may cumulate evidence against him . . . . Second, the jury may have used the evidence of one case to convict the defendant in another case even though that evidence would have been inadmissible at a separate trial. . . . [Third] joinder of cases that are

factually similar but legally unconnected . . . present[s] the . . . danger that a defendant will be subjected to the omnipresent risk . . . that although so much [of the evidence] as would be admissible upon any one of the charges might not [persuade the jury] of the accused's guilt, the sum of it will convince them as to all. . . . *State* v. *Atkinson*, 235 Conn. 748, 763, 670 A.2d 276 (1996); see *State* v. *Horne*, 215 Conn. 538, 546–47, 577 A.2d 694 (1990). Nevertheless, because joinder foster[s] economy and expedition of judicial administration; *State* v. *Greene*, 209 Conn. 458, 462, 551 A.2d 1231 (1988); we consistently have recognized a clear presumption in favor of joinder and against severance; *State* v. *Chance*, [236 Conn. 31, 38, 671 A.2d 323 (1996)] . . . and, therefore, absent an abuse of discretion, we will not second guess the considered judgment of the trial court as to the joinder or severance of two or more charges.

"The court's discretion regarding joinder, however, is not unlimited; rather, that discretion must be exercised in a manner consistent with the defendant's right to a fair trial. Consequently, we have identified several factors that a trial court should consider in deciding whether a severance may be necessary to avoid undue prejudice resulting from consolidation of multiple charges for trial. These factors include: (1) whether the charges involve discrete, easily distinguishable factual scenarios; (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part; and (3) the duration and complexity of the trial. . . . If any or all of these factors are present, a reviewing court must decide whether the trial court's jury instructions cured any prejudice that might have occurred. . . . *State* v. *Cassidy*, [236 Conn. 112, 133, 672 A.2d 899, cert. denied, 519 U.S. 910, 117 S. Ct. 273, 136 L. Ed. 2d 196 (1996)]; see *State* v. *Chance*, supra, 236 Conn. 42–43; *State* v. *Boscarino*, 204 Conn. 714,

722–24, 529 A.2d 1260 (1987)." (Citation omitted; internal quotation marks omitted.) *State* v. *Delgado*, 243 Conn. 523, 532–33, 707 A.2d 1 (1998).

We begin our analysis by noting that the defendant does not address on appeal the first and third *Boscarino* factors, namely, whether the charges against him involve discrete, easily distinguishable factual scenarios and the duration and complexity of the trial. See *State* v. *Boscarino*, supra, 204 Conn. 722–24. The defendant thus fails to argue, with respect to the first *Boscarino* factor, that consolidation was improper in light of the trial court's prior ruling denying his motion in limine to exclude other misconduct evidence, which allowed the jury to use the evidence in the cases of Julia S. and Kristin C. to convict the defendant in the case of Sarah S. See *State* v. *King*, 187 Conn. 292, 299, 445 A.2d 901 (1982) ("obvious example of possible prejudice" in the consolidation of cases is that "jury will use the evidence of one crime to convict the defendant of the other [crime]"). In other words, the defendant does not claim that the effect of admitting the common scheme evidence was "significant enough to impair the defendant's right to the jury's fair and independent consideration of the evidence in each case." *State* v. *Boscarino*, supra, 723. We therefore limit our analysis to the second, and only, *Boscarino* factor addressed by the defendant. It is the defendant's burden on appeal to show that joinder was improper by proving substantial prejudice that could not be cured by the trial court's instructions to the jury. See id., 721. In the present case, the defendant's principal claim is that the cases should not have been joined because the alleged abuse of Sarah S. was much more brutal and shocking than the alleged abuse of Julia S. and Kristin C. He therefore argues that the evidence of abuse in Sarah S.'s case compromised the jury's ability to consider fairly the charges against him in the cases of Julia S. and Kristin C. and that the

trial court's instructions failed to mitigate the resulting prejudice because they did not clearly admonish the jury to consider each case separately.[26] We agree.

We have recognized that "the crime of sexual assault [is] violent in nature, irrespective of whether it is accompanied by physical violence. Short of homicide, [sexual assault] is the *ultimate violation of self*. It is also a violent crime because it normally involves force, or the threat of force or intimidation, to overcome the will and the capacity of the victim to resist. [Although sexual assault] is very often accompanied by physical injury to the [victim] . . . [it] can also inflict *mental and psychological* damage." (Emphasis in original; internal quotation marks omitted.) *State* v. *Rivera*, 260 Conn. 486, 491–92, 798 A.2d 958 (2002). Not all crimes of sexual assault, however, are equally brutal and shocking. See *State* v. *Stevenson*, 43 Conn. App. 680, 691, 686 A.2d 500 (1996), cert. denied, 240 Conn. 920, 692 A.2d 817 (1997). For example, although "[s]exual assaults in the first degree can be characterized as brutal . . . [s]ome . . . evince a greater degree of brutality or shocking behavior than others. The question then becomes whether one of the sexual assault crimes . . . is so brutal and shocking when compared with the other, that a jury, even with proper instructions, could not treat them separately." Id., 691–92.

The effect of testimony regarding the intimate details of sexual misconduct on a jury's ability to consider separate charges in a fair and impartial manner cannot be underestimated. See *State* v. *Boscarino*, supra, 204

---

[26] The defendant's argument that the court improperly failed to instruct the jury not to consider the evidence in Sarah S.'s case when deliberating on the other two cases is similar to the argument that he could have made with respect to the first *Boscarino* factor, that is, that the court's admission of common scheme evidence prevented the jury from distinguishing among the facts and making an independent determination of guilt in each of the three cases.

Conn. 723. In *Boscarino*, we determined that the trial court abused its discretion by permitting the defendant to be tried jointly on four separate charges of first degree sexual assault arising from four factually similar, but legally unrelated cases. Id., 715–18. We concluded that "[t]he prejudicial impact of joinder in these cases [involving sexual assault at knifepoint] was exacerbated by the violent nature of the crimes with which the defendant was charged. Joinder gave the state the opportunity to present the jury with the intimate details of each of these offenses, an opportunity that would have been unavailable if the cases had been tried separately . . . [thus compromising] the jury's ability to consider fairly the charges against him" in each of the unrelated cases. Id., 723.

The trial court in the present case abused its discretion in joining the cases of Sarah S., Julia S. and Kristin C. for trial because the defendant's abuse of Sarah S. was substantially more egregious than his abuse of the other two girls. Consequently, joinder prevented the jury from an impartial consideration of the charges in the latter two cases. See id.; *State* v. *Stevenson*, supra, 43 Conn. App. 691–92.

The trial court's decision to admit the testimony of. Julia S., Kristin C. and Kaitlyn M. in Sarah S.'s case as evidence of a common plan or scheme also had the corresponding effect of permitting the jury, following the joinder, to view the testimony of Sarah S. as bearing on the defendant's culpability with respect to Julia S. and Kristin C. Furthermore, the trial court's instructions to the jury did not mitigate the resulting prejudice to the defendant. The jury instructions specifically advised that if the jury believed that: (1) the testimony of Sarah S., Julia S., Kristin C. and Kaitlyn M. was credible; (2) the defendant's actions constituted misconduct; and (3) there was sufficient similarity in the charged crimes, the jury could use the testimony of all four girls as

evidence of a pattern or course of criminal conduct by the defendant.

Moreover, although the court repeatedly instructed the jury to consider the seventeen counts separately, it never advised the jury at any point in the proceedings to distinguish the charges relating to Sarah S. from the charges relating to Julia S. and Kristin C. Indeed, not only does the state concede that the trial court refrained from instructing the jury that it could not consider the evidence in Sarah S.'s case in determining the defendant's guilt in the other two cases, but it insists that the court properly gave the *opposite* instruction when it advised the jury that it could look at the evidence in all three cases to determine if that evidence showed a common scheme on the part of the defendant, and, if it did, that the jury could use the evidence to convict the defendant in each case. Accordingly, the defendant was substantially prejudiced by the joinder of the cases because the court instructed the jury that it could consider the significantly more egregious evidence of abuse in the case of Sarah S. to convict the defendant in the cases of Julia S. and Kristin C.

This prejudice was exacerbated by the state's closing argument, which continuously referred to the seventeen charges, nine incidents and four girls in a manner suggesting that all were part of a single plan or scheme. During the argument, the state frequently spoke of the charges and incidents by referring to their location, rather than to the victim, as when it discussed the "incidents of touching" that took place in the "kitchen, laundry room, laundry room, taping lesson, wrestling, patting." The state's discussion thus blurred the distinction between the abuse suffered by Sarah S. and the abuse suffered by the other three girls and made it far more difficult for the jury to reach an independent determination of the defendant's guilt in the cases

involving Julia S. and Kristin C. See *State* v. *Boscarino*, supra, 204 Conn. 723.

The state cites *State* v. *David P.*, 70 Conn. App. 462, 800 A.2d 541, cert. denied, 262 Conn. 907, 810 A.2d 275 (2002), to suggest that joinder was appropriate in the present case because the defendant's abuse of Sarah S. was not unusually brutal and shocking when compared with his abuse of Julia S. and Kristin C. We disagree.

In *David P.*, the defendant was charged in three separate informations in connection with first degree sexual assaults involving three different victims. S*tate* v. *David P.*, supra, 70 Conn. App. 464–65. In the first case, the defendant digitally penetrated the victim's vagina. Id., 465. In the second case, he forced the victim to have sexual intercourse with him and to perform oral sex. Id., 466. In the third case, the defendant placed his hand under the victim's shirt and down her pants. Id. The court concluded that the three incidents were factually similar and that "the assaults against all three victims involved a similar degree of physical force and similar threats." Id., 468. The court also determined that "the evidence of each assault would likely be admissible in the companion cases as evidence of prior misconduct that is relevant to show a pattern of criminal activity." Id., 469.

*David P.* is inapposite in the present case because the defendant's abuse of Julia S., Kristin C. and Kaitlyn M. was not sufficiently similar to that of Sarah S. to establish a common plan or scheme. Moreover, the defendant in *David P.*, who touched all of the victims in the vaginal area, was charged with sexual assault in the first degree in each of the three cases. In contrast, the defendant in the present case was charged with attempted sexual assault in the first degree only in the case of Sarah S. because the abuse she suffered far exceeded the defendant's abuse of Julia S. and Kristin

C. Accordingly, the state's reliance on *David P.* is unpersuasive in the present context.

The state also contends that separate trials would provide the defendant with no significant benefit in light of the trial court's decision to admit testimony of a common scheme in Sarah S.'s case. That argument, however, has no merit in light of our determination that the trial court's decision to admit the testimony of a common scheme was improper.

Accordingly, we conclude that the three cases were improperly consolidated for trial and we reverse the judgments of the trial court with respect to the cases of Julia S. and Kristin C.[27] and remand the cases for new trials.

## IV

## CONCLUSION

On remand, in light of our conclusions in parts II and III of this opinion, no evidence of a common scheme to abuse Julia S., Kristin C. or Kaitlyn M. will be admissible in the trial involving Sarah S., nor will evidence of a common scheme to abuse Sarah S. be admissible in the trials involving Julia S. or Kristin C.

The judgments are reversed and the cases are remanded for new trials.

In this opinion the other justices concurred.

---

[27] This conclusion makes it unnecessary to reach the merits of the defendant's three remaining claims on appeal, namely, that: (1) the trial court improperly precluded the testimony of the defendant's alibi witness on the ground that Practice Book § 40-21 requires a defendant to give notice of an alibi witness for instances of uncharged misconduct and the testimony of the alibi witness in this case would have been collateral to the issues at trial; (2) the trial court improperly refused to conduct a thorough inquiry into a credible allegation of juror misconduct; and (3) the state failed to present evidence sufficient to prove beyond a reasonable doubt that the defendant violated the second prong of § 53-21 (1), risk of injury to a child, as alleged in count ten of the information.