STATE OF CONNECTICUT *v.* EDDIE SCHMIDT
(AC 26343)

Bishop, DiPentima and Hennessy, Js.

Argued October 11—officially released December 20, 2005

*Pamela S. Nagy,* special public defender, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Elpedio N. Vitale*, former senior assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Eddie Schmidt, appeals from the judgment of conviction, rendered after a jury trial, of felony murder in violation of General Statutes § 53a-54c, conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (4), and robbery in the first degree in violation of General Statutes §§ 53a-8 and 53a-134 (a) (4). On appeal, the defendant claims that the trial court (1) failed to instruct the jury on accomplice testimony, (2) improperly admitted into evidence as indicative of consciousness of guilt a letter written by the defendant and improperly charged the jury regarding consciousness of guilt, and (3) improperly declined to give the defendant's requested jury instruction on DNA evidence. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In the late night hours of November 10, 2001, the defendant, Thelburt Hampton, Kashon Pearson, Kenyon Joseph and a man known as "Cochise" were gathered at the Malikowski Circle housing project in New Britain, smoking marijuana and consuming alcohol. Joseph, Cochise and the defendant left and returned about twenty minutes later with a maroon Buick. All five then got into the car and drove to Meriden in search of more marijuana.

Derling Mercado and several of his friends were gathered by his house at 24 Camp Street in Meriden. The group consisted of Mercado, Carlos Figueroa, Luis Gonzalez, Ezequiel Rivera, Alexander Rivera, Victor Rivera and Isaias Barreto. Figueroa was carrying a handgun in a holster in the small of his back. Gonzalez was

wearing a long gold chain, with a medallion of the Virgin Mary and a red ruby. After a few minutes of discussion, Figueroa and Victor Rivera decided to leave and walked along the street toward Figueroa's car.

As Mercado and his friends were standing on the street, a maroon car slowly drove up and stopped. The passenger in the front seat rolled down the window and asked Gonzalez if the group had any marijuana. Gonzalez said no and turned back to his group of friends. The front seat passenger exited the car with a gun, told Gonzalez to give him his chain and pulled the chain off over his head. Joseph then got out of the car with a rifle, Pearson exited the car with a semiautomatic handgun, and Cochise exited the car and ran toward someone who was trying to flee.

At that point, as Figueroa and Victor Rivera approached Figueroa's car, Victor Rivera stated that their friends were being robbed. Figueroa saw a maroon car stopped in the middle of the street and his friends with their hands up, held at gunpoint by five others. Figueroa unholstered his gun and began to move along the side of his car to the door, intending to enter it. Joseph fired the rifle in the direction of Figueroa. The bullet ricocheted off the side of Figueroa's car and into Figueroa's body. Joseph's gunshot precipitated panic, flight and gunfire. As Gonzalez dove for the cover of the parked car, he heard more gunshots and saw Mercado fall to the ground. Gonzalez and Barreto both fled, eventually taking refuge behind a nearby garage. They were joined there by Ezequiel Rivera. The injured Figueroa fled to a nearby wooded area. Victor Rivera had fled in Figueroa's car.

The men in the defendant's group got back into the Buick, and Joseph drove them to New Britain. When they got off a highway, Sergeant William Steck, a New Britain police officer, began following them with his

vehicle's siren on. Joseph continued to drive at a rate of eighty-five miles per hour, and when he eventually slowed, everybody got out of the car while it was still moving. Steck was unable to apprehend anyone.

Among the items that the police recovered from the scene of the shootings were the following: Two live nine millimeter cartridges, three .22 caliber shell casings, one of which was crushed, and two lead bullet fragments. A state pathologist recovered two .22 caliber bullets from the body of Mercado. The police seized a .22 caliber rifle, a black vest and a black fleece hat from the interior of the Buick. The rifle held seventeen live .22 caliber cartridges and one spent .22 shell casing. The police found and seized a third live nine millimeter cartridge from beneath the rear seat of the Buick. A fingerprint belonging to Hampton was lifted from the exterior rear passenger window. When the defendant was arrested, he was wearing a medallion on a chain that Gonzalez identified as being his medallion.

At trial, expert testimony established the following. The two intact .22 caliber shell casings that were recovered from the crime scene had been fired from the rifle recovered from the Buick. The two .22 caliber bullets taken from Mercado's body had been fired from the same weapon, but that weapon was not the .22 caliber rifle. The three nine millimeter cartridges came from the same unidentified weapon. One of the lead fragments was identifiable as a portion of a .22 caliber bullet. The black vest recovered from the Buick held two discernible mixtures of genetic material. The defendant's genetic profile was, to a high degree of statistical probability, included in one mixture and could not be ruled out as being included in the other.

The defendant was charged with felony murder in violation of § 53a-54c, murder in violation of General Statutes §§ 53a-8 and 53a-54a, conspiracy to commit

robbery in the first degree in violation of §§ 53a-48 and 53a-134 (a) (4), robbery in the first degree in violation of §§ 53a-8 and 53a-134 (a) (4), two counts of assault in the first degree in violation of General Statutes §§ 53a-8 and 53a-59 (a) (5), and criminal possession of a firearm in violation of General Statutes § 53a-217c. The jury found the defendant guilty of felony murder, conspiracy to commit robbery in the first degree and robbery in the first degree and acquitted him of the remaining charges. The defendant was given a total effective sentence of sixty-five years incarceration. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court committed reversible plain error when it failed to instruct the jury regarding accomplice testimony as it pertained to the testimony of Hampton. Although the defendant did not request an instruction on accomplice testimony and did not take an exception to the absence of such an instruction, the state conceded at oral argument, pursuant to *State* v. *Ferrara*, 176 Conn. 508, 511, 408 A.2d 265 (1979),[1] that an instruction on accomplice testimony was required in this matter. The state contends, however, that the absence of such a charge was not harmful to the defendant and that the court's instruction effectively amounted to a charge on accomplice testimony. We agree with the state.

The following additional facts are relevant to the defendant's claim. Hampton testified for the prosecution. He stated that he previously had been convicted of robbery and that he then was facing charges of conspiracy to commit robbery in the first degree, larceny in the third degree and violation of probation for his

---

[1] "[W]here warranted by the evidence, it is the court's duty to caution the jury as to the testimony of an accomplice in its charge." *State* v. *Ferrara*, supra, 176 Conn. 511.

participation in the events of November 11, 2001. He acknowledged that the charges relating to the incidents of November 11, 2001, exposed him to a thirty year period of incarceration and that it was his intention to plead guilty to the charges at a future date. He said that he understood that in exchange for his testimony, the state would inform the sentencing court of his cooperation in this matter.

With regard to the events of November 11, 2001, Hampton testified that when he and the others left New Britain in the stolen Buick, Joseph was driving, the defendant was in the front passenger seat and Cochise was in the backseat behind the defendant. Pearson got into the car and sat in the backseat behind Joseph. Hampton sat between Pearson and Cochise. Hampton testified that the defendant was carrying a ".22 revolver" tucked into his pants and that he had seen the defendant with that gun a few days prior to the night in question. He testified that Pearson, who was his good friend, was carrying a nine millimeter semiautomatic gun. Hampton testified that the defendant shot Mercado in the back three times. He testified that as they drove off, the defendant leaned out of the car and fired more gunshots. Hampton stated that while in the car, the defendant was crying and said, "I, I killed him." He testified that the defendant took off his vest while they were on the highway. Hampton stated that when they exited the vehicle, he followed the defendant to his house, where the defendant tried to take the gun apart.

Hampton admitted that he had lied to the police several times. He lied to the police in February, 2002, when he denied any involvement in the crime or that he was present during its commission. He lied to the police in the statement that he gave on May 31, 2002. Hampton lied to protect his good friend, Pearson. He lied by telling the police that he did not know Cochise. He testified that he was trying to protect Cochise.

On appeal, the defendant claims that the jury should have been instructed to scrutinize Hampton's testimony as an accomplice in this case and seeks review under the plain error doctrine. See Practice Book § 60-5.

"The plain error doctrine is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . The plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice." (Internal quotation marks omitted.) *State* v. *Smith*, 275 Conn. 205, 239–40, 881 A.2d 160 (2005).

Whether in the interest of justice we notice this failure to give the accomplice instruction as plain error depends in part on whether the failure was harmful. "The failure to give the accomplice instruction would be harmful only if the absence of this instruction was likely to have affected the jury's verdict. . . . Because the failure to give the accomplice instruction does not violate a constitutional right, it is the defendant's burden to show its harmfulness." (Citation omitted; internal quotation marks omitted.) *State* v. *Taheri*, 41 Conn. App. 147, 153, 675 A.2d 458, cert. denied, 237 Conn. 931, 677 A.2d 1374 (1996).

The court instructed the jury with respect to Hampton as follows: "Now, in addition to the charges pending from the incident alleged in this case, you have also heard evidence that Thelburt Hampton has a violation of probation charge currently pending against him in

court. That evidence was offered only to support a claim that his testimony might be influenced by a hope of obtaining a favorable disposition of all those pending charges. Whether you draw such a conclusion or not is entirely up to you based upon all of the facts and circumstances. This evidence is relevant only on the issue of Thelburt Hampton's credibility."

The court also instructed the jury with respect to credibility as follows: "You should consider all possible bias or prejudice any witness may have, whether for or against the state, or for or against the defendant. You should consider whether the witness has any interest or lack of interest of whatever sort in the outcome of the trial. . . . You should test the evidence any witness has given by your own knowledge of human nature and the motives which influence and control human action."

In resolving the defendant's claim, we examine the court's instruction as a whole, including its instructions regarding credibility in general. The jury was aware of Hampton's motivation and interest in testifying. As noted previously, the court specifically commented that Hampton's testimony might have been influenced by a hope of obtaining a favorable disposition on his pending charges and that this was relevant to his credibility. The court's general instructions regarding credibility also referred the jury to matters of bias and motivation.

Hampton's testimony was not the only evidence inculpating the defendant. Gonzalez also identified the defendant as the front seat passenger who held a gun to his head and stole his medallion. Additionally, when the defendant was arrested, the medallion was in his possession, and the defendant's vest was recovered from the getaway car. Also, as we will discuss in part II, the letter that the defendant wrote to his mother suggesting that his fingerprints might be discovered in the car

was adequate to support an inference of consciousness of guilt.

Finally, the fact that the jury acquitted the defendant on the murder and assault charges indicates that the jury, in fact, did carefully scrutinize Hampton's testimony. From the verdict, it is apparent that the jury, which found the defendant not guilty of the murder charge, did not credit Hampton's testimony that the defendant shot Mercado. Those factors lead us to conclude that the court's failure to give an accomplice testimony jury instruction was not likely to have affected the jury's verdict.

## II

Next, the defendant makes a twofold claim with respect to the consciousness of guilt evidence. He claims that the court improperly admitted such evidence and improperly instructed the jury with respect to that evidence. We disagree.

The following additional facts are pertinent to the defendant's claim. During trial, the court admitted into evidence, over the objection of the defendant, a portion of a letter written by the defendant to his mother from prison on September 16, 2002. The portion of the letter, admitted as tending to demonstrate a consciousness of guilt, stated: "I don't only have people saying it was me, they have my prints on the car interior, but I have a defense for that. I left my vest in the car so they have that and the police bring that back to the lab for a DNA check for hairs and fibers."

In fact, the police did not find any fingerprint belonging to the defendant in or on the car. The court instructed the jury regarding the consciousness of guilt evidence, to which the defendant merely noted an exception without further elaboration.

## A

The defendant first claims that the court improperly admitted the letter as consciousness of guilt evidence because the letter reasonably could not have supported an inference of consciousness of guilt. We disagree.

The standard of review of evidentiary rulings is well established. "[T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) *State v. Gonzalez*, 272 Conn. 515, 542, 864 A.2d 847 (2005).

The defendant claims that the court abused its discretion in admitting the letter because there was no indication that the statements in the letter were false, the state relied on the truth of the statements to prove his guilt, and the statements did not exculpate him and were not made in an effort to conceal his involvement in the crime.

"Our Supreme Court has . . . made clear that . . . consciousness of guilt [evidence] goes to the question of the defendant's state of mind, a determination which in turn requires an assessment of the defendant's motivations in making the statements at issue." *State v. Hinds*, 86 Conn. App. 557, 566, 861 A.2d 1219 (2004), cert. denied, 273 Conn. 915, 871 A.2d 372 (2005). "In seeking to introduce evidence of a defendant's consciousness of guilt, [i]t is relevant to show the conduct of an accused . . . as well as any statement made by him subsequent to an alleged criminal act, which may

be inferred to have been influenced by the criminal act. . . . [M]isstatements of an accused, which a jury could reasonably conclude were made in an attempt to avoid detection of a crime or responsibility for a crime or were influenced by the commission of the criminal act, are admissible as evidence reflecting a consciousness of guilt." (Citation omitted; internal quotation marks omitted.) *State* v. *Riser*, 70 Conn. App. 543, 548, 800 A.2d 564 (2002).

In his letter, the defendant described the evidence that he thought the police had against him. In fact, the police did not find any fingerprints belonging to him in the car. That was a misstatement by the defendant that could have been inferred as intimating his belief that his fingerprints would be found in the car because he was, in fact, in the car on the night in question. He indicated that he had a defense to his fingerprints being in the car. The jury reasonably could have inferred that the defendant made that statement to exculpate himself. The defendant admits that he left his vest in the car and that it was being tested for DNA, but does not state when he left his vest in the car. Because the jury reasonably could have inferred a consciousness of guilt from the letter written by the defendant, the court did not abuse its discretion in admitting the letter into evidence.

B

The defendant also claims that the court's instruction regarding consciousness of guilt was improper and misleading. The defendant concedes that his claim was not preserved, but seeks review under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989),[2] or the plain error doctrine. See Practice Book § 60-5.

---

[2] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of

"This court previously has recognized that unpre-
served challenges to jury instructions that *mandate*
inferences adverse to a defendant may sufficiently
implicate constitutional rights to satisfy the second con-
dition of *Golding*. . . . By contrast, instructions
addressing *permissive* inferences are not of constitu-
tional magnitude." (Citation omitted; emphasis in origi-
nal; internal quotation marks omitted.) *State* v. *Alston*,
272 Conn. 432, 448, 862 A.2d 817 (2005). "It has . . .
been stated numerous times that consciousness of guilt
issues are not constitutional and, therefore, are not
subject to review under the . . . *Golding* standard."
(Internal quotation marks omitted.) *State* v. *Smith*, 91
Conn. App. 133, 137, 880 A.2d 959, cert. denied, 276
Conn. 917, 888 A.2d 86 (2005). Because the defendant's
claim fails to satisfy the second prong of *Golding*, we
need not address the other prongs. Although the defen-
dant also seeks plain error review, the claim here does
not present the type of extraordinary situation that war-
rants plain error review. Accordingly, we decline to
review his claim.

III

The defendant finally claims that the court improp-
erly declined to give his requested charge regarding
DNA evidence. We disagree.

The defendant filed a request to charge with the court
seeking an instruction that "unless it can be shown that
the circumstances are such that the DNA could have
been impressed only at the time the crime was perpe-
trated, the presence of the defendant's DNA does not
establish his connection with the crime charged." After
the court's final instructions to the jury, the defendant

a fair trial; and (4) if subject to harmless error analysis, the state has failed
to demonstrate harmlessness of the alleged constitutional violation beyond
a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213
Conn. 239–40.

objected because the requested instruction on DNA evidence was not given. In refusing to give the instruction, the court stated that the requested instruction was misleading in that because the DNA was found on the jacket and was used to identify the jacket, the timing of when the DNA was deposited on the jacket was irrelevant.

"The principal function of a jury charge is to assist the [jurors] in applying the law correctly to the facts which they might find to be established . . . and therefore, we have stated that a charge must go beyond a bare statement of accurate legal principles to the extent of indicating to the jury the application of those principles to the facts claimed to have been proven." (Internal quotation marks omitted.) *State* v. *DeJesus*, 92 Conn. App. 92, 104–105, 883 A.2d 813 (2005).

The DNA of the defendant was found on his vest that he left in the car, not on the car itself or at the crime scene. The relevant inquiry was to determine whether the vest belonged to the defendant, not the timing of the deposit of the DNA on the vest. The instruction requested by the defendant did not logically relate to the issues to be determined by the jury. Accordingly, the court's refusal to instruct the jury as requested by the defendant was proper.

The judgment is affirmed.

In this opinion the other judges concurred.