STATE OF CONNECTICUT *v.* LARRY DAVIS
(AC 26039)

Schaller, Harper and Hennessy, Js.

Argued September 18—officially released December 12, 2006

*Ira B. Grudberg*, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *James G. Clark*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, Larry Davis, appeals from the judgments of conviction, rendered after a jury trial, of numerous criminal offenses stemming from separate informations.[1] On appeal, the defendant claims

---

[1] Specifically, the defendant was convicted of assault in the first degree in violation of General Statutes §§ 53a-8 (a) and 53a-59 (a) (5), carrying a pistol without a permit in violation of General Statutes § 29-35, criminal possession of a firearm in violation of General Statutes § 53a-217, failure to appear in the first degree in violation of General Statutes § 53a-172, robbery in the first degree in violation of General Statutes § 53a-132 (a) (4) and larceny in the second degree in violation of General Statutes § 53a-123 (3). The defendant was also convicted of two counts of being a persistent dangerous felony offender in violation of General Statutes § 53a-40 (a) and (f). In a matter tried to the court, the defendant was found to have violated his probation in violation of General Statutes § 53a-32.

that the trial court improperly (1) consolidated and failed to sever three separate informations, (2) admitted evidence of his parole status, (3) permitted his former criminal defense attorney to testify and (4) found that the defendant had violated the conditions of his probation. We disagree and affirm the judgments of the trial court.

The jury reasonably could have found the following facts. In September, 1998, the first victim, Victoria Standberry, had been introduced to the defendant by her best friend, Taraneisha Brown. Brown and the defendant were involved in a personal relationship. On September 27, 1998, Standberry asked Brown for payment toward a substantial debt owed by Brown. Brown replied that she would return Standberry's telephone call but never did.

The next day, the defendant received a telephone call in the afternoon and left work early. On the evening of September 28, 1998, Standberry parked her vehicle in the Pro Park parking lot located near Yale-New Haven Hospital (hospital), where she was employed in the food and nutrition department. Brown knew that Standberry parked in that particular lot when working at the hospital. Standberry left the hospital carrying a plate of food at approximately 9:25 p.m. and went to her vehicle. As she was placing the food in her vehicle, she observed an individual approach. She attempted to close her door, but it was forced open. The defendant came up to Standberry, said "revenge," and shot her several times before slowly walking away.[2]

The next day, Standberry identified the defendant as the shooter to the investigating police detective. The police commenced a search for the defendant but were

[2] Standberry testified that she required several operations following the shooting. She was required to get a cadaver bone in her shoulder, and a bullet remained in her hip and knee.

unsuccessful in locating him. The defendant missed his October 20, 1998 meeting with his parole officer. Law enforcement agents eventually apprehended the defendant in Atlanta, Georgia, on September 4, 1999. After returning to Connecticut on April 19, 2000, the defendant was released on bond.

Attorney Thomas Farver represented the defendant and attended a pretrial conference on October 1, 2001. The court, *Fracasse, J.*, scheduled the defendant's trial for October 9, 2001, and Farver informed the defendant of this date. The defendant failed to appear at the courthouse on October 9 and 10, 2001, and the court issued a warrant for his arrest. Members of the Connecticut violent crime fugitive task force searched for the defendant and learned that he was residing in Florida. The defendant was arrested in Palm Beach County on October 6, 2003, and was returned to Connecticut on December 3, 2003.

These events resulted in the state's charging the defendant with assault in the first degree, carrying a pistol without a permit, criminal possession of a firearm, failure to appear in the first degree and, in a part B information, being a persistent dangerous felony offender. These charges were filed under docket number CR00-490576.

The second victim, Lenwood E. Smith, Jr., was at a club in New Haven on January 25, 2002. After speaking with the defendant for approximately twenty minutes, he left at 2 a.m. The defendant stopped Smith in the parking lot and asked for a ride to Sheffield Street. Smith agreed, and the defendant and his friend entered Smith's vehicle. After arriving, the defendant asked Smith to drive them to Carmel Street, where an individual known as "Mizzy" owed him money. After Smith drove to the bottom of a hill, the defendant took out a gun and threatened him. Smith continued on to Carmel

Street and parked. The defendant placed his gun against Smith's head and demanded money. Smith gave the defendant his wallet and told him that he could get more from an automated teller machine. Smith drove to a nearby bank and, after parking, fled to a nearby gas station. Smith telephoned the police and showed them the bank parking lot where he had left his vehicle. The police recovered Smith's vehicle approximately one week later.

The events surrounding the Smith incident resulted in charges against the defendant of robbery in the first degree, larceny in the second degree and, in a part B information, being a persistent dangerous felony offender. These charges were filed under docket number CR03-24537.

A summary of the evidence presented against the defendant with respect to a third victim, Leonard Hughes, is necessary for our discussion. There was evidence presented that Hughes was the superintendent of a building at 260 Dwight Street in New Haven. During the early morning of March 13, 2002, the defendant rang Hughes' doorbell and said he was there to pick up items that an individual known as "Magnetic"[3] had left for him. These items included a motor vehicle,[4] a safe, a bulletproof vest and 2.5 kilograms of cocaine. The defendant entered the apartment, pointed a gun at Hughes and ordered him to turn over the requested items. The defendant took the keys to the motor vehicle and specifically asked for the cocaine. Hughes responded that there was no cocaine in the apartment. After being told to get on his knees, Hughes indicated that he would give the defendant the cocaine.[5] The two

---

[3] "Magnetic" referred to Nathaniel Wilson, Hughes' cousin, who was incarcerated in New York at that time.

[4] The motor vehicle was registered to Hughes, who used it and paid for the registration.

[5] Hughes testified that despite his statement to the defendant, there was no cocaine present in his apartment.

men walked into a storage area, and Hughes managed to duck behind a steel door, escape through a window and flee to a nearby hotel. Hughes reported the incident to the police, who searched for the defendant, but were unable to locate him. Later that day, police officers recovered Hughes' motor vehicle.

The events surrounding the Hughes' incident led to the defendant's being charged with burglary in the second degree, robbery in the first degree and larceny in the second degree. The jury found the defendant not guilty of all the charges pertaining to the Hughes incident and guilty of all the charges pertaining to the Standberry and Smith incidents, as well as two counts of being a persistent dangerous felony offender. The court also found that the defendant had violated the terms of his probation and imposed a total effective sentence of eighty years imprisonment. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court improperly consolidated and failed to sever three separate informations. Specifically, he argues that consolidation of the assault and robbery cases, as well as the refusal to sever the matters, resulted in undue prejudice to his right to a fair trial. We disagree.

The following additional facts are necessary for our resolution of this claim. The state filed a motion, dated March 9, 2004, to consolidate multiple files against the defendant for a single trial. The defendant objected to the state's motion. The court denied the state's motion with respect to an information charging the defendant with entering a house, demanding money at gunpoint and threatening children, and granted the motion with respect to the remaining informations.

During the course of the proceedings, the defendant, on several occasions, renewed his objection to consolidation and moved to sever the charges against him. The defendant also filed a postverdict motion for a new trial alleging that the improper joinder deprived him of a fair trial. The court denied all of the these motions.

We begin our analysis of the defendant's claim by setting forth the relevant legal principles and standard of review. "In Connecticut, joinder of cases is favored. . . . Joinder expedites the administration of justice, reduces the congestion of trial dockets, conserves judicial time, lessens the burden upon citizens who must sacrifice both time and money to serve upon juries, and avoids the necessity of recalling witnesses who would otherwise be called upon to testify only once." (Internal quotation marks omitted.) *State* v. *Banks*, 59 Conn. App. 112, 123, 755 A.2d 951, cert. denied, 254 Conn. 950, 762 A.2d 904 (2000); see also *State* v. *David P.*, 70 Conn. App. 462, 466–67, 800 A.2d 541, cert. denied, 262 Conn. 907, 810 A.2d 275 (2002); *State* v. *Snead*, 41 Conn. App. 584, 587, 677 A.2d 446 (1996).

Despite this deferential standard, the court's "discretion regarding joinder, however, is not unlimited; rather, that discretion must be exercised in a manner consistent with the defendant's right to a fair trial." *State* v. *Delgado*, 243 Conn. 523, 532, 707 A.2d 1 (1998). "[Our Supreme Court has recognized] that an improper joinder may expose a defendant to potential prejudice for three reasons. First, when several charges have been made against the defendant, the jury may consider that a person charged with doing so many things is a bad [person] who must have done something, and may cumulate evidence against him . . . . Second, the jury may have used the evidence of one case to convict the defendant in another case even though that evidence would have been inadmissible at a separate trial. . . . [Third] joinder of cases that are factually similar but

legally unconnected . . . present[s] the . . . danger that a defendant will be subjected to the omnipresent risk . . . that although so much [of the evidence] as would be admissible upon any one of the charges might not [persuade the jury] of the accused's guilt, the sum of it will convince them as to all." (Internal quotation marks omitted.) Id.

"General Statutes § 54-57 and Practice Book § 829 [now § 41-19] expressly authorize a trial court to order a defendant to be tried jointly on charges arising separately. In deciding whether to sever informations joined for trial, the trial court enjoys broad discretion, which, in the absence of manifest abuse, an appellate court may not disturb. . . . *The defendant bears a heavy burden of showing that the denial of severance resulted in substantial injustice and that any resulting prejudice was beyond the curative power of the court's instructions.* . . . [W]hether a joint trial will be substantially prejudicial to the rights of the defendant . . . means something more than that a joint trial will be less advantageous to the defendant. . . .

"Furthermore, we have identified several factors that a trial court should consider . . . . These factors include: (1) whether the charges involve discrete, easily distinguishable factual scenarios; (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part; and (3) the duration and complexity of the trial. . . . If any or all of these factors are present, a reviewing court must decide whether the trial court's jury instructions cured any prejudice that might have occurred." (Citation omitted; emphasis added; internal quotation marks omitted.) *State* v. *Cassidy*, 236 Conn. 112, 132–33, 672 A.2d 899, cert. denied, 519 U.S. 910, 117 S. Ct. 273, 136 L. Ed. 2d 196 (1996), overruled in part on other grounds by *State* v. *Alexander*, 254 Conn. 290, 296, 755 A.2d 868 (2000); see also *State* v. *Boscarino*, 204 Conn. 714, 720–21, 529

A.2d 1260 (1987); *State* v. *Santaniello*, 96 Conn. App. 646, 652–53, 902 A.2d 1, cert. denied, 280 Conn. 920, 908 A.2d 545 (2006). The defendant claims that the first and second factors weigh in favor of severance.[6] We address each in turn.

## A

The defendant first contends that factual similarities between the assault case and the robbery cases prompted the jury to use the evidence in one case to find him guilty in the other. The defendant refers to the following factual similarities: each incident occurred in New Haven, the alleged perpetrator used a gun and each victim identified the defendant both before and during trial. With respect to this claim, the defendant primarily relies on *State* v. *Horne*, 215 Conn. 538, 577 A.2d 694 (1990), for support that the court improperly joined the cases against him and denied his motion for severance.

In *Horne*, the defendant was charged in four separate informations of robbing four separate retail stores in Bridgeport. Id., 540. These robberies took place over approximately four and one-half months. The first robbery occurred on February 25, 1986, when the defendant entered a clothing store, showed the owner a gun and stole approximately $90. Id., 540–41. The second robbery took place on March 25, 1986, at an ice cream parlor. Id., 541. The defendant ordered a banana split and, as the employee turned to prepare his order, informed her that he had a gun and demanded that she point out where the money was kept. Id. The defendant then absconded with approximately $30. Id. The third robbery, this time at a yarn shop, occurred on May 8,

---

[6] The jury heard evidence from eighteen witnesses over the course of four days. The defendant does not argue, however, that the third factor, which is that the matter was unduly long or complex, weighed in favor of severance.

1986. Id. As the owner wrote up a sales slip, the defendant displayed a gun, ordered the owner to crawl to a back room and stole money from the cash register as well as the owner's purse. Id. Finally, on June 12, 1986, the defendant displayed a gun to an employee working at the Uniform Boutique. Id., 541–42. After removing $25 from the register and the employee's bank card from her purse, the defendant then perpetrated a sexual assault. Id., 542. Our Supreme Court stated that "[t]he facial similarity between the four cases exposed the defendant to the potential prejudice that the jury would decide, cumulatively, that the defendant was responsible for a one-man crime wave of armed robberies of small stores and shops in the Bridgeport area." Id., 548.

In our view, the present case is distinguishable from *Horne*. The robberies in *Horne* occurred over a four and one-half month time frame. The Standberry assault occurred on September 28, 1998, approximately three years and three months prior to the Smith robbery and approximately three years and six months prior to the Hughes incident. The Standberry assault stemmed from a disagreement regarding the repayment of a debt owed to Standberry by the defendant's girlfriend. The defendant manifested the retaliatory nature of the assault by stating, prior to shooting Standberry, "revenge." In contrast, the Smith incident was a discrete, factually dissimilar robbery that happened in a motor vehicle. The Hughes incident occurred at an apartment building, where, according to the testimony, the defendant sought to recover cocaine, a bulletproof vest and a motor vehicle. In short, this was not the type of "one-man crime wave" discussed in *State* v. *Horne*, supra, 215 Conn. 548.[7] Each case was sufficiently factually dissimilar so that the defendant was not exposed to potential prejudice from the jury.

---

[7] We also note that the significant factor of a sexual assault that was present in *Horne* is absent from the present case. See part I B.

## B

The defendant next claims that the Standberry assault exposed to the jury brutal and shocking conduct that unfairly prejudiced him. Specifically, the defendant argues that the evidence pertaining to the shooting of Standberry and her resulting injuries "aroused the passions and emotions of the jury such that it interfered with its ability to fairly and objectively consider [his] guilt or innocence in the consolidated cases." In support of this argument, the defendant relies on *State* v. *Ellis*, 270 Conn. 337, 852 A.2d 676 (2004), *State* v. *Horne*, supra, 215 Conn. 538, and *State* v. *Boscarino*, supra, 204 Conn. 714. We are convinced that the present case is distinguishable from those relied on by the defendant.

We begin by acknowledging that the assault on Standberry was a serious crime that contained an element of violence. We conclude, however, that this conduct was not so brutal or shocking as to create a substantial risk that the jury would treat the evidence cumulatively. See *State* v. *Snead*, supra, 41 Conn. App. 588; *State* v. *Yopp*, 35 Conn. App. 740, 753, 646 A.2d 298 (1994). "Substantial injustice might result to a defendant where the evidence of one of the several crimes charged will show such brutality on his part that it is apt to arouse the passion of the jury against him to such an extent that they probably would not give fair consideration to the evidence relating to the other charges. *Such a situation, however, is rare* . . . ." (Emphasis added.) *State* v. *Silver*, 139 Conn. 234, 240–41, 93 A.2d 154 (1952).

In order to demonstrate our disagreement with the defendant's reliance on *Ellis, Horne* and *Boscarino*, we must provide a brief summary of each case. In *Ellis*, a softball coach was charged under three separate informations with sexually abusing three victims, all of whom were connected to the defendant's team. *State*

v. *Ellis*, supra, 270 Conn. 339–42. Two of the victims testified that the defendant had placed his hand on their breasts over their clothes. Id., 344–46. The third victim, however, stated that the defendant made inappropriate comments to her over the telephone and, on several different occasions, grabbed her breasts, moved his hand over her body and thighs, placed his hands under her skirt, attempted to kiss her, masturbated in front of her, requested that she perform oral sex on him and penetrated her vagina with his fingers. Id., 347–49. Our Supreme Court summarized this abuse as "far more frequent and severe." Id., 359. The court then concluded that joinder was improper because "the defendant's abuse of [the third victim] was substantially more egregious than his abuse of the other two girls" and therefore prevented impartial consideration of the charges relative to the other two victims. Id., 378.

In *Horne*, the state charged the defendant with robbing four separate retail stores. *State* v. *Horne*, supra, 215 Conn. 540. The state alleged that during one of these robberies, he sexually assaulted the store employee. Id., 542. The court failed to give the jury a preliminary instruction on the risks of confusion among the cases. Id., 543. On the basis of the totality of the circumstances in *Horne*, our Supreme Court held that the trial court improperly joined the cases. Id., 540. In addition to the defendant's brutal and shocking conduct during the sexual assault, the similarity of the robberies and the overlapping evidence were factors that our Supreme Court considered in its decision. Id., 552–53.

In *State* v. *Boscarino*, supra, 204 Conn. 715–16, the defendant was charged in two separate informations with four separate sexual assaults. In reversing the trial court's decision to consolidate, our Supreme Court again considered all of the relevant factors. The factual similarities between the assaults were significant enough to impair the jury's ability to consider each

one separately. Id., 723. The complexity of the trial, approximately fifty-five witnesses and sixty-six exhibits, coupled with its length, approximately ten weeks, further enhanced the probability that the jury would weigh the evidence cumulatively against the defendant. Id., 723–24. These factors, combined with the allegations of brutal and shocking conduct, resulted in the conclusion that the trial court had abused its discretion.

Contrary to the facts of *Ellis, Horne* and *Boscarino*, the present case does not involve sexual assault. Our Supreme Court has acknowledged the shocking and unique nature of such crimes. "We have recognized that the crime of sexual assault [is] violent in nature, irrespective of whether it is accompanied by physical violence. Short of homicide, [sexual assault] is *the ultimate violation of self*. It is also a violent crime because it normally involves force, or the threat of force or intimidation, to overcome the will and the capacity of the victim to resist. [Although sexual assault] is very often accompanied by physical injury to the [victim] . . . [it] can also inflict *mental and psychological* damage." (Emphasis in original; internal quotation marks omitted.) *State* v. *Ellis*, supra, 270 Conn. 377; *State* v. *Horne*, supra, 215 Conn. 549–50. In *State* v. *Jennings*, 216 Conn. 647, 659, 583 A.2d 915 (1990), our Supreme Court, in distinguishing that case from *Boscarino*, specifically noted the absence of "sexual derangement." See also *State* v. *Morton*, 59 Conn. App. 529, 536, 757 A.2d 667 (2000).

Additionally, *Horne* and *Boscarino* presented other factors that weighed in favor of severance. In the present case, contrary to those cited by the defendant, the informations contained allegations of factually dissimilar crimes, and the defendant's trial was not unduly long or complex. Moreover, there was an orderly chronological presentation of evidence by the state. We conclude, therefore, that the defendant's reliance on *Ellis*,

*Horne* and *Boscarino* is misplaced and that the assault of Standberry, when compared to the robberies, was not so brutal and shocking as to result in unfair prejudice to the defendant.

C

Even if we were to assume arguendo that any of the factors weighed in favor of the defendant, we would conclude that the court's repeated and detailed jury instructions cured any prejudice. See, e.g., id., 536–37. Our Supreme Court has stated that "in cases in which the likelihood of prejudice is not overwhelming . . . such curative instructions may tip the balance in favor of a finding that the defendant's right to a fair trial has been preserved." (Internal quotation marks omitted.) *State* v. *Atkinson*, 235 Conn. 748, 766–67, 670 A.2d 276 (1996). In the present case, the court at three different times provided instructions regarding the manner in which the members of the jury were to consider the separate informations. First, during voir dire, all the panels of potential jurors were told that each information constituted a separate case and were being tried together for the purpose of convenience.[8] Second, after

---

[8] The court provided similar, although not identical, instructions to each panel. For example, on May 11, 2004, the court stated that the defendant was entitled to and must be given a separate and independent determination of each count and each information.

The court stated: "The fact that there are three cases here as opposed to just one has absolutely no bearing whatsoever on whether the defendant is guilty or not guilty. The presumption of innocence is no less here because there is more than one charge or case. The defendant may just as well be not guilty in three cases as he can be in one. Whether the defendant is guilty or not guilty will ultimately depend on whether the state can meet its burden of proof with respect to each of these charges. *What I am telling you is that you cannot and must not assume that just because of the number of charges against him or because of their similarity, that the defendant has done anything wrong. You cannot make that assumption.*

"Your verdict on any count, the charge, does not control your verdict on the others. You must consider each count separately and independently, considering only the evidence that applies to it. That rule applies also to each information. You must separate the evidence. The defendant cannot be penalized in any way because the court, for the convenience of trial has

the jury was impaneled and sworn in, the court again emphasized the importance of treating each information as a distinct matter.[9] Third, the court reiterated this concern during its charge after the close of evidence.[10]

combined these cases. These three separate cases have been consolidated for trial by order of the court for the sake of judicial economy, which has nothing to do with whether the defendant is guilty or not guilty in any of these cases." (Emphasis added.)

[9] The court instructed the jury as follows: "There are three separate cases being tried here for the convenience of trial. The defendant is entitled to and must be given by you a separate and independent determination of whether he is guilty or not guilty, not only as to each count, but also as to each case or information. The fact that there are three cases here as opposed to just one has absolutely no bearing whatsoever on whether the defendant is guilty or not guilty. The presumption of innocence is no less here because there is more than one charge or case. The defendant may just as well be not guilty in three cases as he can be in one. Whether the defendant is guilty or not guilty will ultimately depend on whether the state can meet its burden of proof with respect to each of the charges before you. What I am flat out telling you is that you cannot and must not assume that the defendant has done something wrong just because of the number of charges against him or because of any similarity between them. Your verdict on any count—on any one count or charge does not control your verdict on any other. You must consider each count separately and independently, considering only the evidence that applies to that count. That rule applies to all three informations as well. You must separate the evidence. The defendant cannot be penalized in any way because the court, for the convenience of trial, has combined these cases. There are three separate cases that have been consolidated for trial by my order for the sake of judicial economy, which has nothing to do with whether or not the defendant is guilty or not guilty of any of these cases. During voir dire, each of you assured us that consideration would not prejudice the defendant in any way, and that you would consider each information and each count separately. It is your obligation to honor that assurance."

[10] The court charged the jury as follows: "You must keep in mind that we have been trying three separate cases here. In the interest of time and economy, these cases have been tried together. Such consolidation has absolutely no bearing at all on the guilt or innocence of the defendant. The defendant is entitled to and must be given a separate and independent determination of whether he is guilty or not guilty not only as to each information but also with respect to each count of each information under which he is charged. The presumption of innocence is not less here because of the number of charges or the similarity. These factors are not evidence, and you must infer nothing from them. Whether the defendant is guilty or not guilty must be determined solely on whether the state, by its evidence presented here in court, has met its burden of proof not only as to each information, but also as to each count of each information. Again, you must

It is well established that "[t]he jury [is] presumed to follow the court's directions in the absence of a clear indication to the contrary." (Internal quotation marks omitted.) *State* v. *Flowers*, 278 Conn. 533, 547, 898 A.2d 789 (2006); *State* v. *McCleese*, 94 Conn. App. 510, 514, 892 A.2d 343, cert. denied, 278 Conn. 908, 899 A.2d 36 (2006); *State* v. *Howard*, 88 Conn. App. 404, 421, 870 A.2d 8 (jury presumed to follow instructions to consider each information separately), cert. denied, 275 Conn. 917, 883 A.2d 1250 (2005). In the present case, the court's careful and comprehensive instructions to the jury ameliorated any potential prejudice caused by the consolidation of the three informations. There is no reason to believe, therefore, that the joinder compromised the jury's ability to consider the evidence in each information separately and in an objective and dispassionate manner. See, e.g., *State* v. *Cassidy*, supra, 236 Conn. 134.

Finally, we note that the order in which the jury reached and returned its verdicts indicates that it considered each information separately. The jury returned a guilty verdict in the Smith robbery and then continued

infer nothing from consolidation, which was ordered by the court solely for the purpose of judicial economy. You cannot and must not assume that the defendant did something wrong just because of the number of charges against him or because of any similarity between them. The defendant cannot be penalized in any way because the court has combined these three separate cases. Even if you find that the defendant had been proven to have committed any one or more of the crimes charged against him, you may not use that conclusion to infer that he is therefore guilty of any of the other crimes charged against him. Your verdict on any one count does not control your verdict on any other count in any information. In short, each charge against the defendant requires an independent determination of whether the defendant is guilty or not guilty, considering only that evidence which applies to that particular charge. There can be no spillover of evidence; that is, each count in each information must be judged solely on the strength of the evidence that applies to it without regard to the evidence in any other count. I instruct you that your finding in any one count does not in itself establish a basis for similar findings in any other count. For all practical purposes, the defendant is to be considered on trial separately in each information and count."

its deliberations with respect to the Standberry assault and the Hughes robbery. The next day, the jury informed the court that it had reached a verdict with respect to the Standberry assault. After further instructions from the court, the jury returned a not guilty verdict as to the Hughes robbery. Although the order in which the jury returned its verdicts is not dispositive as to whether the court abused its discretion; see *State* v. *Boscarino*, supra, 204 Conn. 724; it is an indication that the jury properly considered each information separately. See *State* v. *Atkinson*, supra, 235 Conn. 766 ("by returning a verdict of not guilty on the charge of possession of a weapon in a correctional institution . . . the jury evidently was able to separate the two cases and did not blindly condemn the defendant on his participation in the murder"); *State* v. *Rodriguez*, 91 Conn. App. 112, 120–21, 881 A.2d 371 ("Although the jury found the defendant guilty of all the counts of burglary, attempt to commit burglary, larceny and criminal trespass that it considered, it found the defendant not guilty of one count of breach of the peace in the second degree. That acquittal demonstrated that the jury was able to consider each count separately and, therefore, was not confused or prejudiced against the defendant."), cert. denied, 276 Conn. 909, 886 A.2d 423 (2005); *State* v. *Whittingham*, 18 Conn. App. 406, 413, 558 A.2d 1009 (1989). We conclude that the court did not abuse its discretion in consolidating the three informations or denying the defendant's motion for severance.

## II

The defendant next claims that the court improperly admitted evidence of his parole status. Specifically, he argues that such information was highly prejudicial because it showed that he previously had committed a criminal act. According to the defendant, this prejudice outweighed its probative value as to consciousness of guilt. We disagree.

The following additional facts are necessary for our discussion. At the time of the Standberry assault, the defendant had been on parole and was required to meet monthly with his parole officer. The defendant had complied with the terms of his parole prior to the assault but missed his meetings thereafter.

The defendant filed a motion in limine to preclude the state from introducing evidence regarding his parole status. The defendant argued that the prejudicial impact of such information exceeded its probative value. The state countered that such evidence was relevant to the defendant's consciousness of guilt because he stopped meeting with his parole officer after the shooting. The court denied the defendant's motion, finding that such information would not "inflame the passions of the jury."

During the trial, the state called James Woods, the defendant's parole officer, as a witness. Prior to his testimony, the court provided the jury with the following limiting instruction: "I need to give you a limiting instruction before we continue . . . . You are going to hear some testimony from this witness concerning [the defendant's] status as a person being on parole. This evidence is being offered by the state for the limited purpose of showing evasive conduct by the defendant, and the steps taken to locate the defendant and the results thereof. It is only offered on that limited issue.

"You cannot use this evidence for any other purpose. The defendant—the fact that the defendant was on parole, is not evidence of his guilt in this case. He is not on trial for any other crimes. It had no bearing on his guilt or innocence in this case, and that is the status alone, nor can you infer from such evidence of being on parole that the defendant is a bad character or has a criminal disposition."

Woods testified that the defendant initially had done well on parole. Woods lowered the defendant's supervision level from weekly reporting to monthly. The defendant reported to Woods on September 22, 1998, but missed his October 20, 1998 appointment. Woods stated that he undertook steps to locate the defendant but was unsuccessful.

During the charge to the jury, the court repeated its limiting instructions. "Now, I have two limiting instructions for you concerning consciousness of guilt evidence. . . . [E]vidence of the defendant's status as a parolee was offered by the state for the limited purpose of showing the evasive conduct by the defendant and the steps taken to locate him with respect to the state's claim that the defendant demonstrated a consciousness of guilt. You cannot use the evidence of his status for any other purpose. The fact that the defendant was on parole is not evidence of his guilt in this case, nor is he on trial for any crime not charged in any information. You cannot infer from such evidence that the—you cannot infer from any evidence that the defendant was on parole, that he is of bad character or has a criminal disposition."

We now set forth the applicable standard of review. "Unless an evidentiary ruling involves a clear misconception of the law, [t]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . [The reviewing court] will make every reasonable presumption in favor of upholding the trial court's ruling." (Internal quotation marks omitted.) *State* v. *Smith*, 275 Conn. 205, 219, 881 A.2d 160 (2005). "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful." (Internal quotation marks omitted.) *State* v. *Sawyer*, 279 Conn.

331, 352, 904 A.2d 101 (2006). In *Sawyer*, our Supreme Court explained that "a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) Id., 357; see also *State v. Ritrovato*, 280 Conn. 36, 56, 905 A.2d 1079 (2006).

Generally, "evidence of prior misconduct is inadmissible to prove that a defendant is guilty of the crime of which he is accused. . . . Nor can such evidence be used to suggest that the defendant has a bad character or a propensity for criminal behavior. . . . Evidence of prior misconduct may be admitted, however, when the evidence is offered for a purpose other than to prove the defendant's bad character or criminal tendencies." (Internal quotation marks omitted.) *State v. Caracoglia*, 95 Conn. App. 95, 115 n.12, 895 A.2d 810, cert. denied, 278 Conn. 922, 901 A.2d 1222 (2006).

The state offered the evidence of the defendant's status as a parolee at the time of the Standberry assault for the purpose of establishing consciousness of guilt. "Our Supreme Court has . . . made clear that . . . consciousness of guilt [evidence] goes to the question of the defendant's state of mind, a determination which in turn requires an assessment of the defendant's motivations . . . . In seeking to introduce evidence of a defendant's consciousness of guilt, [i]t is relevant to show the conduct of an accused . . . as well as any statement made by him subsequent to an alleged criminal act, which may be inferred to have been influenced by the criminal act." (Citation omitted; internal quotation marks omitted.) *State v. Schmidt*, 92 Conn. App. 665, 675–76, 886 A.2d 854 (2005), cert. denied, 277 Conn. 908, 894 A.2d 989 (2006).

We conclude that the court did not abuse its discretion in admitting the defendant's parole status into evidence. Such evidence is not per se inadmissible. See

*State* v. *Silva*, 201 Conn. 244, 248–49, 513 A.2d 1202 (1986) (court properly admitted evidence of parole status to explain manner in which inmates heard defendant's confession); *State* v. *Vidro*, 71 Conn. App. 89, 93–96, 800 A.2d 661 (no abuse of discretion where court admitted evidence of defendant's parole status to show investigative efforts and sequence of events leading to defendant's arrest), cert. denied, 261 Conn. 935, 806 A.2d 1070 (2002). In the present case, the evidence of the defendant's parole status was not introduced for the purpose of demonstrating that because the defendant had been convicted of a criminal offense in the past, it was likely that he had committed the crimes with which he was charged. Instead, it was offered as consciousness of guilt evidence. "The state of mind which is characterized as guilty consciousness or consciousness of guilt is strong evidence that the person is indeed guilty . . . and, under proper safeguards . . . is admissible evidence against an accused." (Internal quotation marks omitted.) *State* v. *Camacho*, 92 Conn. App. 271, 294, 884 A.2d 1038 (2005), cert. denied, 276 Conn. 935, 891 A.2d 1 (2006). The consciousness of guilt in this case was the defendant's failure to meet with his parole officer and subsequent disappearance from the state. Our Supreme Court has explained that "[f]light, when unexplained, tends to prove a consciousness of guilt. . . . Flight is a form of circumstantial evidence. Generally speaking, all that is required is that the evidence have relevance, and the fact that ambiguities or explanations may exist which tend to rebut an inference of guilt does not render evidence of flight inadmissible but simply constitutes a factor for the jury's consideration." (Internal quotation marks omitted.) *State* v. *Coltherst*, 263 Conn. 478, 521–22, 820 A.2d 1024 (2003); *State* v. *O'Neil*, 67 Conn. App. 827, 832, 789 A.2d 531 (2002). The jury reasonably could have inferred that the defendant's sudden failure to meet with Woods indicated consciousness of guilt. There was,

therefore, substantial probative value to the defendant's parole status.

Additionally, the comprehensive and thorough limiting instructions, given prior to Woods' testimony and during the court's charge to the jury, minimized any unduly prejudicial impact. See *State* v. *Anderson*, 86 Conn. App. 854, 870, 864 A.2d 35 (jury presumed to follow court's instructions absent clear evidence to contrary), cert. denied, 273 Conn. 924, 871 A.2d 1031 (2005). Of course, "[a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury." (Internal quotation marks omitted.) *State* v. *Erhardt*, 90 Conn. App. 853, 861–62, 879 A.2d 561, cert. denied, 276 Conn. 906, 884 A.2d 1028 (2005). The care with which the court weighed the evidence and devised measures for reducing its prejudicial effect weighs against a finding of abuse of discretion. See id., 862. In short, we conclude that the court did not abuse its discretion by admitting evidence of the defendant's parole status.

### III

The defendant next claims that the court improperly permitted his former criminal defense attorney to testify. Specifically, he argues that allowing such testimony violated the attorney-client privilege. We are not persuaded.

The following additional facts are necessary for our discussion. The state called Farver as a witness. Outside of the presence of the jury, Farver testified that he had represented the defendant in October, 2001. After extensive argument regarding the attorney-client privilege, the court overruled the defendant's objections to

Farver's testifying before the jury.[11] The only information that the state sought to elicit was whether Farver had informed the defendant of the start date for his criminal trial, as this information was relevant to the charge of failure to appear.

Farver testified before the jury that he had represented the defendant in a criminal matter in October, 2001. Farver stated that he received a telephone call from the court's clerk, requesting him to attend a pretrial conference. At that meeting, he learned that the defendant's trial was scheduled to begin on October 9, 2001. Farver communicated that information to the defendant. He stated that he did not see the defendant either on October 9 or 10, 2001.

We begin our discussion by setting forth the legal principles germane to our discussion. "The basic principles of the attorney-client privilege are undisputed. Communications between client and attorney are privileged when made in confidence for the purpose of seeking legal advice. . . . Connecticut has a long-standing, strong public policy of protecting attorney-client communications. . . . This privilege was designed, in large part, to encourage full disclosure by a client to his or her attorney so as to facilitate effective legal representation. . . . Rule 1.6 (a) of the Rules of Professional Conduct effectuates that goal by providing in relevant part that [a] lawyer shall not reveal information relating to representation of a client unless the client consents after consultation . . . . The attorney-client privilege seeks to protect a relationship that is a mainstay of our system of justice. . . . Indeed, [our Supreme Court] has stated: It is obvious that professional assistance would be of little or no avail to the client, unless his legal adviser were put in possession of all the facts relating to the subject matter of inquiry or litigation,

---

[11] The defendant declined, on the record, to waive the privilege.

which, in the indulgence of the fullest confidence, the client could communicate. And it is equally obvious that there would be an end to all confidence between the client and attorney, if the latter was at liberty or compellable to disclose the facts of which he had thus obtained possession; and hence it has become a settled rule of evidence, that the confidential attorney, solicitor or counselor can never be called as a witness to disclose papers committed or communications made to him in that capacity, unless the client himself consents to such disclosure." (Citations omitted; internal quotation marks omitted.) *Gould, Larson, Bennet, Wells & McDonnell, P.C.* v. *Panico*, 273 Conn. 315, 321–22, 869 A.2d 653 (2005). Our Supreme Court has noted further that "[a]lthough the existence of the privilege encourages the candor that is necessary for effective legal advice . . . *the exercise of the privilege tends to prevent a full disclosure of the truth in court. . . . Therefore, the privilege is strictly construed.*" (Citation omitted; emphasis added; internal quotation marks omitted.) *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, 267 Conn. 279, 330, 838 A.2d 135 (2004). The burden of proving the facts essential to the privilege is on the party asserting it. *State* v. *Hanna*, 150 Conn. 457, 466, 191 A.2d 124 (1963).

The defendant makes two arguments with respect to this issue. He first contends that the court improperly concluded that Farver's testimony that he communicated the trial date to the defendant was not privileged. Second, he maintains that the court failed to balance the need for the testimony with his right to a fair trial. Before addressing each of these arguments, we identify the applicable standard of review. "Because the decision whether to allow an attorney to be called is within the discretion of the trial court, appellate courts will reverse trial court decisions only when there has been an abuse of discretion. . . . The issue is only whether

the trial court acted reasonably." (Citation omitted.) *State* v. *Mathis*, 59 Conn. App. 416, 424, 757 A.2d 55, cert. denied, 254 Conn. 941, 761 A.2d 764 (2000); see also *State* v. *Colton*, 234 Conn. 683, 702, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996). With these principles in mind, we address each argument in turn.

A

The defendant first contends that the court improperly determined that Farver's testimony that he communicated the trial date to the defendant was not privileged. Specifically, he maintains that the court misapplied our Supreme Court's decision of *Ullman* v. *State*, 230 Conn. 698, 647 A.2d 324 (1994). We disagree.

In *Ullman*, the plaintiff, a public defender, was held in criminal contempt for failing to testify in a criminal trial. Id., 699. The plaintiff had represented Eddie Ford in a criminal matter until he withdrew from the case. Id. The state sought to question the plaintiff regarding the existence of a meeting between Ford and the plaintiff for the purpose of showing how Ford could have obtained the telephone number of a witness. Id., 700–701. The plaintiff refused to answer the state's questions despite a direct order from the court. Id., 702. On appeal, our Supreme Court dismissed the plaintiff's writ of error. Id., 724. "We are equally unpersuaded under the facts of this case that the answer to a question posed to the plaintiff as to whether he had met with his client would have encroached upon the attorney-client privilege. The plaintiff met with his client at the New Haven community correctional center, a public institution. Because of the nature of the institution, the plaintiff's meeting with his client would have been witnessed and recorded by department of correction personnel, and the fact that a meeting had taken place would not have been, and could not have been, confidential." Id., 712.

The defendant contends that the issue in *Ullman* concerned whether a meeting took place and not the substance of a communication between an attorney and his or her client. He argues that in this case, the state, in contrast, sought the content of the communication between himself and Farver. This argument, however, fails to acknowledge that not every communication between attorney and client is privileged. As a general rule, "[c]ommunications between client and attorney are privileged when made in confidence for the purpose of seeking legal advice. . . . *A communication from attorney to client solely regarding a matter of fact would not ordinarily be privileged, unless it were shown to be inextricably linked to the giving of legal advice.*" (Citation omitted; emphasis added; internal quotation marks omitted.) *Olson* v. *Accessory Controls & Equipment Corp.*, 254 Conn. 145, 157, 757 A.2d 14 (2000); see also *Ullman* v. *State*, supra, 230 Conn. 711–12; *Dietter* v. *Dietter*, 54 Conn. App. 481, 503–504, 737 A.2d 926, cert. denied, 252 Conn. 906, 743 A.2d 617 (1999); C. Tait, Connecticut Evidence (3d Ed. 2001) § 5.21.1, pp. 309–10. The defendant has failed to establish a direct nexus between the trial date and the giving of legal advice.

The state refers us to *Austin* v. *State*, 934 S.W.2d 672 (Tex. Crim. App. 1996) (en banc), in which the Texas Court of Criminal Appeals was presented with this exact issue. The *Austin* court adopted the rationale of several federal circuits and state courts[12] that have held that a

---

[12] *"United States* v. *Clemons*, 676 F.2d 124 (5th Cir. 1982); *United States* v. *Uptain*, 552 F.2d 1108 (5th Cir.), cert. denied, 434 U.S. 866, 98 S. Ct. 202, 54 L. Ed. 2d 142 (1977); *In re Grand Jury Proceedings, Des Moines, Iowa*, 568 F.2d 555, 557 (8th Cir. 1977), cert. denied [sub nom. *Black House* v. *United States*], 435 U.S. 999, 98 S. Ct. 1656, 56 L. Ed. 2d 90 [1978]; *United States* v. *Freeman*, 519 F.2d 67 (9th Cir. 1975); *United States* v. *Bourassa*, 411 F.2d 69 (10th Cir.), cert. denied, 396 U.S. 915, 90 S. Ct. 235, 24 L. Ed. 2d 192 (1969); *United States* v. *Hall*, 346 F.2d 875 ([2d] Cir.), cert. denied, 382 U.S. 910, 86 S. Ct. 250, 15 L. Ed. 2d 161 (1965); *United States* v. *Woodruff*, 383 [F. Sup.] 696 (E.D. [Pa.] 1974); *Downie* v. *Superior Court*, 888 P.2d 1306 ([Alaska. App.] 1995); *People* v. *Williamson*, 839 P.2d 519 ([Colo. App.] 1992);

communication from an attorney informing a client of a trial date is not privileged. "The communication of a trial date is a matter collateral to the attorney-client relationship. The attorney receives the information regarding the client's trial date from a third party. The information does not involve the subject matter of the client's legal problems. Therefore, prohibiting disclosure of this communication would not further the general policy of encouraging unrestrained communication between attorney and client. Accordingly, we hold an attorney's communication to the client of a trial setting is not subject to the attorney-client privilege." Id., 675.

We agree with the state that the defendant failed to establish that the communication of a trial date is inextricably linked to the giving of legal advice. The communication of the trial date from Farver to the defendant was not within the scope of the attorney-client privilege. Accordingly, the court did not abuse its discretion by allowing the jury to hear Farver's testimony.

B

The defendant next contends that the court failed to balance the need for the testimony with his right to a fair trial. Specifically, he argues that the court considered only whether Farver's testimony was necessary and unavailable elsewhere and failed to consider whether his right to a fair trial was implicated.[13] We disagree.

_Watkins_ v. _State_, 516 So. 2d 1043 ([Fla. App.] 1987); _Korff_ v. _State_, 567 N.E.2d 1146 (Ind.), cert. denied, 502 U.S. 871, 112 S. Ct. 206, 116 L. Ed. 2d 164 (1991); _State_ v. _Breazeale_, 11 Kan. App. 2d 103, 713 P.2d 973 (1986); and, _State_ v. _Ogle_, 297 Or. 84, 682 P.2d 267 (1984)." _Austin_ v. _State_, supra, 934 S.W.2d 674 n.2.

[13] Our Supreme Court has "considered the standard that governs whether a prosecuting attorney or defense attorney can be called as a witness relating to a case in which he had participated as an advocate. . . . [W]e note that courts have been reluctant to allow attorneys to be called as witnesses in trials in which they are advocates. . . . When either party in a criminal case seeks testimony from the prosecuting attorney, the federal courts have

In *Ullman*, our Supreme Court adopted the "compelling need" test as the criteria to determine when an attorney who has been involved professionally in the case may be called as a witness. *Ullman* v. *State*, supra, 230 Conn. 717–18. "The compelling need test strikes the appropriate balance between the need for the information and the potential adverse effects on the attorney-client relationship and the judicial process in general." Id., 718.

After thoroughly reviewing the record, we are satisfied that the court properly weighed the competing factors and did not abuse its discretion by concluding that Farver's testimony satisfied the "compelling need" test. See generally *State* v. *Nunes*, 260 Conn. 649, 689–90, 800 A.2d 1160 (2002) (talismanic phraseology not necessary when appellate court can infer that trial court conducted balancing test). Farver's testimony that he alerted the defendant to the date of the trial was required to establish the knowledge element of the crime of failure to appear. We conclude, therefore, that the court did not abuse its discretion by allowing Farver to testify.

## IV

The defendant's final claim is that the court improperly found that he violated the conditions of his probation. Specifically, he argues that the court improperly

applied a compelling need test. . . . Under this test, the party wishing to call a prosecutor to testify must show that the testimony of the prosecutor is necessary and not merely relevant, and that all other available sources of comparably probative evidence have been exhausted. . . .

"The policy behind the compelling need test in the context of requiring a [defense attorney] to testify is four fold: First, there is the risk that the [defense attorney] may not be a fully objective witness. . . . Second, there exists the justifiable fear that, when a [defense attorney] takes the witness stand, the prestige or prominence of the [defense attorney's] office will artificially enhance his credibility as a witness. . . . Third, the jury may understandably be confused by the [defense attorney's] dual role. . . . Finally, a broader concern for public confidence in the administration of justice suggests the maxim that justice must satisfy the appearance of jus-

credited the testimony of Hughes to find a violation of probation. We are not persuaded.

The following additional facts are necessary. The state alleged that the defendant violated his probation by (1) committing the robbery of Smith, (2) committing the robbery of Hughes and (3) failing to provide his probation officer with certain information regarding his whereabouts and location. This matter was tried to the court while the jury deliberated on the assault and robbery informations. The court found, by a preponderance of the evidence, that the state had proven all three bases under which the defendant violated his probation. At the sentencing hearing, the court found that the beneficial aspects of probation were no longer being served and revoked the defendant's probation.

"[A] revocation of probation hearing has two distinct components and two purposes. A factual determination by a trial court as to whether a probationer has violated a condition of probation must first be made. If a violation is found, a court must next determine whether probation should be revoked because the beneficial aspects of probation are no longer being served." (Internal quotation marks omitted.) *State* v. *Singer*, 95 Conn. App. 844, 849, 898 A.2d 222, cert. granted on other grounds, 280 Conn. 902, 907 A.2d 94 (2006). "To support a finding of probation violation, the evidence must induce a reasonable belief that it is more probable than not that the defendant has violated a condition of his or her probation. . . . In making its factual determination, the trial court is entitled to draw reasonable and logical inferences from the evidence. . . . This court may reverse the trial court's initial factual determination that a condition of probation has been violated only if we determine that such a finding was clearly erroneous. . . . A finding of fact is clearly erroneous

tice." (Citations omitted; internal quotation marks omitted.) *State* v. *Colton*, supra, 234 Conn. 700–701.

when there is no evidence to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling . . . ." (Internal quotation marks omitted.) *State* v. *Gauthier*, 73 Conn. App. 781, 785, 809 A.2d 1132 (2002), cert. denied, 262 Conn. 937, 815 A.2d 137 (2003).

Hughes testified that the defendant came to his home, pointed a gun at him and stole his motor vehicle. It is axiomatic that it was the trial court's province to weigh the credibility of the witnesses. See *State* v. *Durant*, 94 Conn. App. 219, 227, 892 A.2d 302, cert. granted on other grounds, 278 Conn. 906, 897 A.2d 100 (2006). We also note that the court, as the trier of fact with respect to the charge of a violation of probation, was not bound by the jury's findings pertaining to the Hughes robbery. See *State* v. *Gauthier*, supra, 73 Conn. App. 786. We conclude that on the basis of Hughes' testimony, the court's finding was not clearly erroneous.

The judgments are affirmed.

In this opinion the other judges concurred.